121 N.J. Super. 299 (1972)
296 A.2d 668
SARAH BRODY, EXECUTRIX OF THE ESTATE OF EUGENE BRODY, DECEASED AND SARAH BRODY, INDIVIDUALLY, PLAINTIFF,
v.
OVERLOOK HOSPITAL, A CORPORATION OF THE STATE OF NEW JERSEY, ESSEX COUNTY BLOOD BANK, A CORPORATION OF THE STATE OF NEW JERSEY, EASTERN BLOOD BANK, A CORPORATION OF THE STATE OF NEW JERSEY, WILLIAM U. CAVALLARO, BERNARD ERDMAN, AND HELEN BENJAMIN, DEFENDANTS, AND ESSEX COUNTY BLOOD BANK, A CORPORATION OF THE STATE OF NEW JERSEY, DEFENDANT-THIRD PARTY PLAINTIFF,
v.
EASTERN BLOOD BANK, A CORPORATION OF THE STATE OF NEW JERSEY, THIRD PARTY DEFENDANT.
Superior Court of New Jersey, Law Division.
Decided November 13, 1972.
*301 Mr. Ira J. Zarin for plaintiff (Messrs. Zarin, Maran, Lieb & Schneider, attorneys).
Mr. Eugene M. Purcell for defendant Eastern Blood Bank.
Mr. William P. Ries for defendants Benjamin, Erdman and Overlook Hospital.
Mr. Henry Spielvogel for defendant Cavallaro (Messrs. Morgan, Melhuish, Monaghan, McCoid & Spielvogel, attorneys).
Mr. John B. Stone, Jr. for defendant Essex County Blood Bank (Messrs. Ryan, Saros, Davis & Stone, attorneys).
STEINBRUGGE, J.D.C. Temporarily Assigned.
This is an action by Sarah Brody, individually and as executrix of the estate of Eugene Brody, against a hospital, two blood banks, two doctors and a medical technician, to recover damages for the death, by serum hepatitis infection of the blood, of plaintiff's late husband, Eugene Brody. The essential facts are not in dispute. Eugene Brody was duly admitted *302 as a paying patient to Overlook Hospital and there received, upon the advice of his physician Cavallaro, a number of blood transfusions. It is alleged that Brody subsequently developed hepatitis; it is uncontroverted that he shortly thereafter expired.
There are several counts to the amended complaint. The first sets forth a cause of action grounded in negligence by each named defendant individually under the Wrongful Death Act, N.J.S.A. 2A:31-1 et seq. The second sets forth a cause of action accruing to plaintiff by reason of pain and suffering endured by decedent. The third count sets out plaintiff's loss of consortium and of services, and the fourth count alleges that defendant hospital (hereafter "Overlook" or "the hospital") breached implied warranties of merchantability and of fitness for particular purpose, by providing decedent with hepatitis-infected blood which ultimately, it is alleged, caused his death. The fifth and sixth counts are against the blood banks and sound in negligence; the seventh and eighth counts, also against the blood banks, sound in breach of warranty.
The court holds the following:
(1) Suit against defendant Cavallaro (alleged to be decedent's attending physician), against defendant Erdman (alleged to be medical director of Overlook's blood bank), and against defendant Benjamin (alleged to be the Overlook medical technologist in charge of blood for transfusion) will come on to the jury on the theory of negligence. The court intimates no opinion as to whether either of the hospital's two employees, or both of them, would be liable to plaintiff under a theory of strict tort liability or under a theory of breach of implied warranties under the Uniform Commercial Code, because no allegations to this effect have been made by plaintiff.
(2) (A) If the jury finds that serum hepatitis virus was in the blood transfused into decedent under the supervision of Overlook Hospital, and that decedent died as a result *303 of hepatitis, then strict tort liability must be applied to Overlook Hospital.
(B) N.J.S.A. 2A:53A-8 applies only to negligence actions and has no apparent applicability to actions sounding in strict liability. Therefore the amount of damages recoverable is not restricted to the statutory limit.
(3) If the jury finds that decedent died of viral hepatitis, due to contaminated blood at any time under the control of Eastern Blood Bank, the theory of strict tort liability shall apply.
(4) (A) If the jury finds that decedent died of viral hepatitis, due to contaminated blood at any time under the control of Essex County Blood Bank, the theory of strict tort liability shall apply.
(B) N.J.S.A. 2A:53A-7 applies only to negligence actions and has no apparent applicability to actions sounding in strict liability.

I. Overlook Hospital
The case at bar presents in starkest relief the issue of what measurement of liability should attach to a hospital when hepatitis-infected blood is transfused to a patient under the hospital's care and supervision. The question usually is seen to turn on whether the blood is perceived to be a "product" or "goods" sold to the patient, or whether the blood is merely part and parcel of the "services" supplied by the hospital to the patient.[1] If blood is considered a "product" *304 then, under the Uniform Commercial Code, theories of breach of the warranties of merchantability, N.J.S.A. 12A:2-314, and of fitness for particular use, N.J.S.A. 12A:2-315, are applicable. Equally as applicable is the theory of strict tort liability, i.e. liability on the part of the supplier whether or not the supplier was at fault, as expressed in Restatement 2d, Torts, § 402A:
(1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if (a) the seller is engaged in the business of selling such a product, and (b) it is expected to reach the user or consumer in the condition in which it is sold. (2) The rule stated in subsection (1) applies although (a) the seller has exercised all possible care in the preparation and sale of his product, and (b) the user or consumer has not bought the product from or entered into any contractual relation with the seller.
On the other hand, if the hospital's provision of infected blood is considered a "service," then a negligence action alone against the hospital will be maintainable.
The leading authority for the proposition that a paying patient at a hospital who receives impure or infected blood *305 is the recipient of a service and not of a sale of goods, and therefore cannot recover on theories either of breach of warranty or of strict tort liability, is Perlmutter v. Beth David Hospital, 308 N.Y. 100, 123 N.E.2d 792 (1954). This decision by the New York Court of Appeals has had an extremely wide-ranging impact, and until recently was considered the definitive treatment of the subject.[2]
But much has changed since 1954 in the operation of hospitals and the legal principles pertaining thereto. Two recent decisions hold that recovery is possible, on a non-negligence basis, by a patient who receives hepatitis-infected blood during his course of treatment at a hospital. Hoffman v. Misericordia Hospital of Philadelphia, 439 Pa. 501, 267 A.2d 867 (1970), a decision of the Pennsylvania Supreme Court, held that, regardless of whether it was ultimately held that the transfer of blood from defendant-hospital for transfusion into the plaintiff-patient was a "service" or the supplying of a "product," recovery may be permissible on a claim that the hospital breached warranties of merchantability and/or fitness of particular purpose under the Uniform Commercial Code. Cunningham v. MacNeal Memorial Hospital, 266 N.E.2d 897 (Ill. Sup. Ct. 1970) held that blood is a "product" to which the doctrine of strict tort liability is applicable *306 when supplied by a hospital for treatment of a patient's condition. Cunningham rejected the analysis of Perlmutter and held the hospital to strict liability for injuries suffered by a patient who received hepatitis-infected blood. In doing so, the Illinois Supreme Court adopted the views that (1) blood is a "product" within the meaning of Restatement 2d, Torts, § 402A; (2) the product was "sold," and (3) the blood was "in a defective condition unreasonably dangerous to the user." The court rejected the notion that the imposition of strict liability would hamper a hospital's performance of its primary function:
We do not believe in this present day and age, when the operation of eleemosynary hospitals constitutes one of the biggest businesses in this country, that hospital immunity can be justified on the protection-of-the-funds theory, [266 N.E.2d at 904].
However, neither Perlmutter, Hoffman, nor Cunningham addressed themselves to any sound policy reasons for extending the doctrine of strict liability to hepatitis cases. Perlmutter dealt only with the semantic question of whether the transaction (the blood transfusion) was a "sale" or a "service;" Hoffman recognized the problem; Cunningham dealt only with the verbal formula of § 402A.[3]
But policy considerations are of the utmost importance.[4] Justice Traynor of the California Supreme Court put the idea well when he said,
Even if there is no negligence, however, public policy demands that responsibility be fixed wherever it will most effectively reduce the hazards to life and health inherent in defective products that reach the market. It is evident that the manufacturer can anticipate some hazards and guard against the recurrence of others, as the public cannot [Escola v. Coca Cola Bottling Company, 24 Cal.2d 453, 150 P.2d 436 (1944), at 440-441.]
*307 This theory has the effect of forcing the entity that markets the product to consider the "accident costs" of the product[5] when deciding whether and from where to procure it. In the case of blood, the "safety rationale" emphatically applies to hospitals because, as a general rule, each hospital has a choice of several blood banks as potential suppliers.[6] The blood banks stand in the same position to the hospital as the manufacturer of a product does to a distributer  as supplier to marketer. It can be anticipated that adoption of the strict liability standard for the State of New Jersey will have the beneficial effect of forcing hospitals to deal only with those blood banks which have good safety records, thus decreasing the risk of a patient's becoming infected with hepatitis as a result of a transfusion.
Even in the comparatively low number of cases in which the hospital has recourse to only a single blood bank, imposition of strict tort liability may well spur the hospital to take a more active role in influencing the bank's collection processes, i.e., more careful screening of donors.[7] Most importantly, *308 the imposition of strict liability cannot help but force the hospitals both to supervise more carefully their own use of blood, and to encourage medical research to develop either a more satisfactory test for hepatitis or an immunization vaccine to be given against the disease to a patient about to undergo a transfusion.
The court is not impressed with the argument that a hospital faced with strict liability will only pass along its increased costs to its patients, thus negating the safety incentive. Insurers will not write liability policies unless satisfied with the level of care exercised by the hospital. And, even if the cost to each patient is marginally increased, public policy dictates the imposition of strict tort liability.
Another important policy justification for strict liability is that of "loss spreading." If the hospital bears the loss resulting from hepatitis-infected blood, it will tend to spread the loss among all parties, i.e. donors, blood-banks, perhaps its patients.[8] This "allocative effect" will be felt if hospitals allocate their hepatitis costs as a charge on each unit of blood actually used: physicians will automatically more carefully weigh the risks of surgery and transfusions.
This court is mindful of the fact that only nine states still regulate liability for transfusion-associated hepatitis under the common law, while the other 41 have enacted statutes to limit such liability to negligence.[9] No such statute has been enacted in New Jersey.
The court holds that N.J.S.A. 2A:53A-8 applies only to negligence actions. That statute reads in pertinent part as follows:
*309 ... any nonprofit corporation, society or association organized exclusively for hospital purposes shall be liable to respond in damages to such beneficiary [of its works] who shall suffer damage from the negligence of such corporation, society or association or of its agents or servants to an amount not exceeding $10,000.00, together with interest and costs of suit, as the result of any 1 accident and to the extent to which such damage, together with interest and costs of suit, shall exceed the sum of $10,000.00 such nonprofit corporation, society or association organized exclusively for hospital purposes shall not be liable therefor.
Overlook Hospital would fall within the ambit of the statute's coverage only if it is a nonprofit institution. If Overlook Hospital is a nonprofit institution, then its liability would be limited to $10,000 only in negligence actions. The statute speaks specifically and only of "negligence," i.e., the immunity is unmistakably limited to acts of negligence. But the concept of negligence is not relevant to the doctrine of strict liability. One is the antithesis of the other. Wherever the ordinary concept of negligence obtains, a showing of "due care" by the defendant rebuts the plaintiff's contentions. But where strict liability prevails, "due care" is not relevant. Defendant's liability is predicated upon the fact of the injury's occurrence, and not upon any lack of care. Thus the situation at bar is one to which N.J.S.A. 2A:53A-8 has no application.

II. Essex County Blood Bank and Eastern Blood Bank
Defendant Essex County Blood Bank, a charitable corporation, attempts to invoke N.J.S.A. 2A:53A-7 to shield it from liability. That statute reads in pertinent part as follows:
No nonprofit corporation, society or association organized exclusively for religious, charitable, educational or hospital purposes shall * * * be liable to respond in damages to any person who shall suffer damage from the negligence of any agent or servant of such corporation, society or association, where such person is a beneficiary, to whatever degree, of the work of such nonprofit corporation, society or association * * * *310 Reliance on the statute is misplaced. Just as N.J.S.A. 2A:53A-8 is limited to negligence actions, so is N.J.S.A. 2A:53A-7. The concept of "negligence" is foreign to that of "strict liability," and therefore the statute has no application to the situation at bar.
Blood banks fit semantically under the requirements of Restatement 2d, Torts, § 402A. All blood banks sell their product (blood) for a price. If the sold blood is infected with hepatitis virus, that blood is in a "defective condition unreasonably dangerous to the user or consumer" (the ultimate patient). A blood bank's actual business is to sell the product, blood. And it is mandatory that the blood reach the user (the patient) "in the condition in which it is sold": no opening of the container carrying the blood is permitted at any step along the line of distribution.
This court is not the first to apply strict liability to a blood bank furnishing blood that is infected with serum hepatitis virus. Russell v. Community Blood Bank, 185 So.2d 749 (Fla. App. 1966), affirmed by the Florida Supreme Court, Community Blood Bank, Inc. v. Russell, 196 So.2d 115 (1967), reached the identical conclusion on breach of warranty grounds.
Public policy dictates the imposition of strict tort liability on blood banks, if for no other reason than to discourage carelessness in the selection of donors. If the analogy to traditional products-liability law be followed, a blood bank would appear to stand, not in the shoes of a "manufacturer," but in that of a "supplier": it must decide which donors among many (the real "manufacturers") it will buy from. Goldberg v. Kolsman Instrument Corp., 12 N.Y.2d 432, 240 N.Y.S.2d 592, 191 N.E.2d 81 (1963), presented a case where the New York Court of Appeals imposed strict liability on a "final assembler" which received its products from many suppliers. The products arrived in sealed containers that could not be opened for inspection without destroying their utility  just as a blood bank receives phials of donated blood, unopenable for inspection. Cunningham *311 observed that a blood bank's placing the blood in the stream of commerce suffices to impose strict liability: "If the article left the defendant's control in a dangerously unsafe condition * * * the defendant is liable whether or not he was at fault in creating that condition or in failing to discover and eliminate it," 266 N.E.2d at 903.
A blood bank may hold a monopoly in a given area, or it may "compete" with other banks. If the monopoly bank is a volunteer blood bank, it will not be able to pass along too much of the increased cost inevitably associated with strict liability, because too great a price hike will lead to the emergence of commercial blood banks, or to hospitals themselves operating a blood bank. On the other hand, where the monopolistic blood bank is a commercial one, it will even more acutely risk competition if it raises its rates. In those instances where blood banks "compete," the imposition of strict liability will force them to intensify (or in some cases commence) their efforts to find "safe" donors: blood banks with poor safety records will have to charge higher prices, and thus will lose customers.
Where a volunteer blood bank holds a monopoly, strict liability will not end its operations. The blood bank will simply increase its charges, the way all monopolists do when faced with increased costs. Where the volunteer bank is faced with competition, the court believes that the bank would still pass on any cost increases resulting from the imposition of strict liability, because volunteer blood banks have kept their fees lower than what the open market would bring.[10] Should a volunteer blood bank cease operations, this will further insure that less of hepatitis-infected blood will be delivered to hospitals and ultimately to patients.
*312 The "allocative effect" rationale applies to blood banks as well as to hospitals. Where a community has more than one blood bank, strict liability will cause the blood bank with the poorer safety record to charge higher fees. Since hospitals patronize the bank charging the lowest fee, there will be greater demand for blood from the bank with the better safety record. The incidence of hepatitis infection must thus be reduced.
The imposition of strict liability is predicated, not upon fault, but upon physical control over the defective product at a time when the product is in fact defective. (This does not, however, mean a degree of control to such an extent that the defect could theoretically be eliminated by the controller, see, e.g., Goldberg, supra.) For a blood bank to be held strictly liable, the serum hepatitis virus must be in the blood while it is under the blood bank's control.
The usual route that transfused blood follows is from donor to blood bank, and from blood bank to hospital. In the hospital the blood is stored in refrigeration until needed. One unit at a time arrives at the transfusion point. The unit arrives at that point (e.g., operating room, bedside) in its original package. This package identifies the blood type, the blood bank and the identity of the individual donor (this last in code).[11] Since serum hepatitis disease is transmitted through the donor's blood, it follows that the infection must commence its incubation while the blood is still within the donor's body or, at the latest, by needle while the blood is being taken from the donor by the blood bank. Thus, the blood in its infected state (a "defective product") passes through physical control of the blood bank or blood banks and through physical control of the hospital, before being transfused into the patient. There is therefore no *313 problem presented as to whether a blood bank or a hospital might be unfairly burdened with strict liability; at the very least, the defective product, in its defective form, passes through their hands.
It is therefore held that, because transfused blood is a "product," its transferal constitutes a "sale" or "sales." Where the blood ("product") contains serum hepatitis virus, it is in a "defective condition unreasonably dangerous to the user or consumer" (the patient), and the doctrine of strict tort liability applies.
NOTES
[1] Farnsworth, "Implied Warranties of Quality in Non-Sale Cases," 57 Col. L. Rev. 653 (1957);

Franklin, "Tort Liability for Hepatitis: An Analysis and a Proposal," 24 Stan L. Rev. 439 (1972);
Garibaldi, "A New Look at Hospitals' Liability for Hepatitis-Contaminated Blood on Principles of Strict Tort Liability," 48 Chicago Bar Rev. 204 (1967);
Haut & Alter, "Blood Transfusions  Strict Liability," 43 St. John's L. Rev. 557 (1969);
Pollock, "Liability of a Blood Bank or Hospital for a Hepatitis Associated Blood Transfusion in New Jersey," 2 Seton Hall L. Rev. 47 (1970);
Comment, "Blood Transfusions and Human Transplants: A Problem of Proof and Causation," 4 Ind. Legal Forum 518 (1971);
Comment, "Strict Liability for Disease Contracted from Blood Transfusions," 66 Nw. U.L. Rev. 80 (1971);
Comment, "Homologous Serum Hepatitis  Products Liability in a Quandary," 10 Washburn L.J. 77 (1970);
Comment, "Liability for Blood Transfusions Resulting in Serum Hepatitis," 12 Wm. & Mary L. Rev. 86 (1970);
Note, 69 Harv. L. Rev. 391 (1955);
Note, 37 Notre Dame Lawyer 565 (1962);
Note, 18 Okl. L. Rev. 104 (1965);
Note, 29 St. John's L. Rev. 305 (1955);
Note, 103 U. Pa. L. Rev. 833 (1955);
Note, 24 Vand. L. Rev. 645 (1971);
Note, 16 Vill. L. Rev. 983 (1970).
[2] Perlmutter was adopted and used for the basis for decision in the following cases:

Sloneker v. St. Joseph's Hospital, 233 F. Supp. 105 (D. Colo. 1964);
White v. Sarasota County Public Hospital Board, 206 So.2d 19 (Fla. App. 1968), cert. den. 211 So.2d 215 (Fla. 1968);
Hoder v. Sayet, 196 So.2d 205 (Fla. App. 1967);
Lovett v. Emory University, Inc., 116 Ga. App. 277, 156 S.E. 2d 923 (1967);
Carter v. Inter-Faith Hospital of Queens, 60 Misc.2d 733, 304 N.Y.S.2d 97 (Sup. Ct. 1969);
Dibblee v. Dr. W.H. Groves Latter-Day Saints Hospital, 12 Utah 2d 241, 364 P.2d 1085 (1961);
Gile v. Kennewick Public Hospital District, 48 Wash.2d 774, 296 P.2d 662 (1956);
Koenig v. Milwaukee Blood Center, Inc., 23 Wis.2d 324, 127 N.W.2d 50 (1964).
[3] See Comment, 66 Nw. U.L. Rev. 80 (1971), at 87, for criticism of Cunningham as "shallow."
[4] Jackson v. Muhlenberg Hospital, 53 N.J. 138 (1969).
[5] Blum & Kalven, "The Empty Cabinet of Dr. Calabresi," 34 U. Chi. L. Rev. 239 (1967).
[6] American Medical Association, Committee on Blood, Directory of Blood Banking and Transfusion Facilities and Services (1969); American Medical Association, Directory of Blood Banking and Transfusion Facilities and Services (1965).
[7] An effort by a group of hospitals and a volunteer blood bank to agree to an exclusive dealing arrangement led to a complaint before the Federal Trade Commission filed by a commercial bank that was being excluded. The Commission found an unfair trade practice in an opinion that did not mention the dangers of commercial blood. See Community Blood Bank of the Kansas City Area, Inc. [1967-1970 Transfer Binder] Trade Reg. Rep. par. 17, 728, at 23,010 (F.T.C. 1966). The Court of Appeals set the Commission decision aside on the ground that the blood bank, as a nonprofit corporation, was outside the jurisdiction of the F.T.C. See Community Blood Bank of Kansas City Area, Inc., v. Federal Trade Commission, 405 F.2d 1011 (8 Cir.1969).
[8] Calabresi, "Some Thoughts on Risk Distribution and the Law of Torts," 70 Yale L.J. 499 (1961).
[9] For a list of states see 24 Vand. L. Rev. 649-50 (1971), and 24 Stan. L. Rev. 474, n. 203 (1972).
[10] National Academy of Sciences, National Research Council, An Evaluation of the Utilization of Human Blood Resources in the United States (1970);

Hemphill, Survey on Blood Bank Fees and Replacement Policies of Institutional Members of the American Association of Blood Banks (1944).
[11] See regulations issued by the National Institute of Health, Public Health Service, United States Department of Health, Education and Welfare. 42 C.F.R., §§ 73.3002(e), 73.3005, 73.600(a)(2). 42 U.S.C., § 262(a).