218 N.J. Super. 537 (1987)
528 A.2d 86
DONNA FRAME, ET AL., PLAINTIFFS/APPELLANTS/CROSS-RESPONDENTS,
v.
DR. N. KOTHARI, M.D., AND HEALTH CARE PLAN OF NEW JERSEY, DEFENDANTS/RESPONDENTS/CROSS-APPELLANTS.
Superior Court of New Jersey, Appellate Division.
Argued June 10, 1987.
Decided July 8, 1987.
*538 Before Judges DREIER, SHEBELL and STERN.
Gary D. Ginsberg argued the cause for plaintiffs/appellants/cross-respondents (Friedman, Bafundo, Ginsberg & Porter, attorneys; Gary D. Ginsberg, on the briefs).
Richard A. Grossman argued the cause for defendants/respondents/cross-appellants (Grossman & Kruttschnitt, attorneys; Richard J. Bolger, on the brief).
The opinion of the court was delivered by SHEBELL, J.A.D.
Plaintiffs, Donna Frame and Charles Frame, appeal as inadequate the $10,000 jury verdict returned on the wrongful death *539 claim for their 10 month old son and the award of $500 to each of them for their emotional distress in observing the child's suffering prior to his death because of the malpractice of defendants, Dr. Nita Kothari and Health Care Plan of New Jersey ("HCP"). Defendants have cross-appealed only as to the judgment for emotional pain and suffering to the parents. The jury awarded no damages in the survivorship action for conscious pain and suffering of the infant. No appeal has been taken from that verdict.
The infant decedent, Arik Frame, died during the early morning hours of January 23, 1982 after undergoing emergency surgery for a cerebral hemorrhage. The infant had fallen down 13 steps at home between 6:30 a.m. and 7:30 a.m. on the previous day and was taken immediately to the HCP clinic where he was treated by Dr. Kothari, an employee of the HCP. The infant was not admitted to any facility at that time and was allowed to return home. The parents testified that at approximately 2 p.m. on the day of the child's fall the father called HCP and advised Dr. Kothari that the baby was vomiting and that his eyes began pivoting and rolling up into his head when he was bathed. They asserted that the father was advised to let the baby sleep and to check him every four hours by waking him. When the parents attempted to wake the child at approximately 6 p.m. he was in what has been described as a moribund or near-death state. They rushed the child to a hospital where cerebral bleeding was diagnosed and emergency surgery undertaken. The child was observed by the parents as he was transported for x-rays prior to surgery and again after surgery. He appeared as if sleeping on each occasion. The surgery was performed around midnight and the parents left the hospital around 3 a.m. They returned to the hospital at approximately 5 a.m. after receiving a telephone call from the hospital. Either during the phone call or when they arrived at the hospital they were advised that their son was dead.
The parents separated approximately seven months after the death of the child. Although apparently neither parent had *540 remarried at the time of trial, the mother learned in the summer of 1983 that she was pregnant by another man. She gave birth to a baby girl on January 3, 1984. Donna Frame testified that she blamed her husband for her son's death and that his personality changed after the baby's death, causing each to go separate ways.
Plaintiffs contend that the sum of $10,000 to compensate them for the loss of Arik is inadequate. A motion for a new trial as to damages only was filed by the plaintiffs but denied by the trial court. This issue is therefore appropriately before us for determination as to whether it clearly appears that there was a miscarriage of justice under the law. R. 2:10-1.
Plaintiffs note that pursuant to N.J.S.A. 2A:31-1 et seq. parents of a deceased infant are entitled to be compensated for the "pecuniary injuries" they suffer as a result of their child's death as that term has been interpreted by our Supreme Court in the case of Green v. Bittner, 85 N.J. 1 (1980). In Green a jury verdict which found no pecuniary loss in the death of a high school senior of average intelligence was reversed. The Court found the verdict to be a miscarriage of justice and held that "damages should not be limited to the well-known elements of pecuniary loss such as the loss of the value of the child's anticipated help with household chores, or the loss of anticipated direct financial contributions by the child after he or she becomes a wage earner." 85 N.J. at 4. The Court stated that "the jury should be allowed, under appropriate circumstances, to award damages for the parents' loss of their child's companionship as they grow older, when it may be most needed and valuable, as well as the advice and guidance that often accompanies it." Ibid. These losses however must be confined to their pecuniary value, excluding emotional loss because of the statutory limitation of N.J.S.A. 2A:31-5. Id. at 12 (citing cases).
As our Supreme Court so vividly points out in Green, the greatest loss must go uncompensated under present law:

*541 No pecuniary value may be attributed to the emotional pleasure that a parent gets when it is his or her child doing the caretaking rather than a stranger, although such pleasure will often be the primary value of the child's service, indeed, in reality, its most beneficial aspect. This loss of added emotional satisfaction that would have been derived from the child's companionship is fundamentally similar to the emotional suffering occasioned by the death. Both are emotional rather than "pecuniary injuries," one expressed in terms of actual emotional loss, the other in terms of lost prospective emotional satisfaction. In another sense, the loss of the prospective emotional satisfaction of the companionship of a child when one is older is but one example of the innumerable similar prospective losses occasioned by the child's death  all of which, plus much more, is included in the emotional suffering caused by the death. [Id. at 12-13].
Plaintiffs advance no argument regarding the adequacy of the trial court's jury charge on this damage issue. They point out that Green establishes that a jury is to consider the parents' loss of direct financial contribution; loss of guidance and companionship; and loss of advice and counsel. Also to be included in the award is the value of the services that the child might render not only until majority but any continuation of such services or activities which might reasonably be expected to continue thereafter. Id. at 11.
Plaintiffs' expert on economic loss noted that when a child is 10 months old it "is very difficult to determine exactly what kind of services that particular child would provide to the parents over their lifetime." He opined that assistance in making this determination could be gathered from the tradition in the family of either parent on the theory that the child would have grown up in that type of environment. No family background evidence was presented to assist the jury in this regard. The jury did have knowledge that this family unit only survived approximately seven months following the death of the infant and that the mother had another child shortly thereafter. This evidence may have caused the jury to doubt that the environment the child would have been brought up in, had he survived, would have resulted in the child providing significant services to the parents in the future. The Supreme Court in Green recognized the "speculative quality of the inferences" that the mere parent-child relationship, without a showing of special *542 circumstances, would result in the rendering of companionship, services, guidance and advice and counsel. Nonetheless such elements were found to be proper subjects for consideration by the jury.
However, the fact that these elements may be considered does not require that the jury in every case find that the loss as to each item exists to a substantial degree. The absence of evidence of special circumstances to demonstrate the extent or probability of the loss suffered and the difficulty in obtaining a grasp of what the future might hold with respect to the abilities, characteristics and inclinations of this 10-month old regarding his future relations with his parents renders us unable to say that an award of $10,000 constitutes a miscarriage of justice. Further, we must give deference to the trial judge's "feel of the case." Baxter v. Fairmont Food Co., 74 N.J. 588, 600 (1977). We find no pervading sense of wrongness such as would cause us to be clearly convinced that the verdict is terribly wrong. Id. at 598; State v. Johnson, 42 N.J. 146, 162 (1964). This award must therefore be affirmed.
Plaintiffs maintain that the jury awards of $500 to each parent for the emotional pain and suffering caused by their seeing their child in a moribund state were insufficient. Defendants/cross-appellants urge that the claims for emotional damages should not have been considered at all because plaintiffs do not meet the criteria set forth in Portee v. Jaffee, 84 N.J. 88 (1980). In Portee our Supreme Court was called upon to determine whether a mother who was not in a position to suffer potential personal injury could recover damages for the emotional anguish of watching her young child suffer and die in an accident caused by defendants' negligence. 84 N.J. at 90. The Portee Court clarified and expanded the doctrine it established in Falzone v. Busch, 45 N.J. 559 (1965). Falzone allowed recovery for the infliction of emotional distress where the negligence also caused physical harm to the traumatized individual despite the absence of physical impact. 45 N.J. at 569. *543 The seven-year-old Portee youngster was trapped in an elevator shaft and when the elevator was activated the boy was dragged and injured and became wedged in the shaft. Rescuers worked for several hours in an attempt to free him as the mother watched her son moan, cry out, flail about and die while still trapped. She became severely depressed and seriously self-destructive as a result of witnessing the incident. 84 N.J. at 91. Our Supreme Court noted in Portee that Falzone did not expressly limit liability to those cases in which the distressed plaintiff had been subjected to an unreasonable risk of physical harm. Id. at 93-94.
Portee turns upon the foreseeability that the parents would be observing the death of their own child. Id. at 95. The Court referred to its earlier decision in Caputzal v. The Lindsay Co., 48 N.J. 69 (1966) wherein it observed:
[L]iability should depend on the defendant's foreseeing fright or shock severe enough to cause substantial injury in a person normally constituted, thus then bringing the plaintiff within the "zone of risk." [Id. at 76 (quoting 2 F. Harper & F. James, The Law of Torts, § 18.4 at 1036 (1956))]. [Id. at 94].
The Portee Court then proceeded with "... the refinement of principles of liability to remedy violations of reasonable care while avoiding speculative results or punitive liability." 84 N.J. at 97. The Court's purpose in undertaking this task stemmed from its recognition that:
[n]o loss is greater than the loss of a loved one, and no tragedy is more wrenching than the helpless apprehension of the death or serious injury of one whose very existence is a precious treasure. The law should find more than pity for one who is stricken by seeing that a loved one has been critically injured or killed. [Ibid.]
The criteria of Dillon v. Legg, 68 Cal.2d 728, 441 P.2d 912, 69 Cal. Rptr. 72 (1968) were invoked as being determinative of "whether an emotional injury would be compensable because `foreseeable'...." 84 N.J. at 97. The required elements established in Portee are: 1) the death or serious physical injury of another caused by defendant's negligence; 2) existence of a marital or intimate familial relationship; 3) that the plaintiff *544 witnessed the incident which resulted in death or serious injury; 4) resulting severe emotional distress. Id. at 98-101.
Our focus in the present case in upon the question of whether the plaintiff can be said to have observed the incident which resulted in death or serious injury which Portee recognized as an "equally essential" element. Id. at 99. We do not perceive that there was an incident as contemplated in Portee and as recognized by this court in Polikoff v. Calabro, 209 N.J. Super. 110 (App.Div. 1986). No doubt the jury in making an award to each parent found that their observing the infant in a moribund state brought about emotional trauma to both parents. However, the negligence which was found to have caused the condition consisted only of a failure to properly diagnose the condition of the patient thereby precluding institution of immediate medical care including surgical intervention.
In Polikoff plaintiff's theory that the child did not die as a result of the disease or condition for which she was being treated but that her death was directly caused by an improperly conducted, physically intrusive medical procedure observed by the mother was deemed sufficient to satisfy the requirement that the plaintiff witnessed the incident which resulted in death or serious injury. 209 N.J. Super. at 114-115.
The trial court here in denying defendants' motion for summary judgment rendered a written opinion carefully outlining the post-Portee application of the four essential elements for a prima facie case for negligent infliction of emotional distress. Frame v. Kothari, 212 N.J. Super. 498 (Law.Div. 1985). The Law Division was particularly impressed by the following reference to Berman v. Allan, 80 N.J. 421 (1979) in the Portee opinion:
Our decision in Berman could support liability in this case. The trauma of witnessing the agonizing death of one's child may be no less substantial than the shocking realization that one's newborn child is profoundly crippled and will remain so for life. [212 N.J. Super. at 505 (quoting Portee, 84 N.J. at 95)].
We think it clear, however, that the Berman Court was recognizing not a derivative claim of the parents for emotional *545 damage caused by negligently inflicted injury to the infant, but the parents' own claim for emotional damages caused directly to them as a result of the doctor's negligence in failing to afford them the option of obtaining an abortion which they may have elected if they had been informed that the child was afflicted with Downs Syndrome. We do not find that the Berman theory of liability is available to the parents in this case. We recognize that it is arguable here that since the parents directly sought the doctor's advice concerning care of the infant that they too should be afforded an independent cause of action for the negligence of the doctor. However, we believe that applying such a theory in this situation would do violence to the principles recognized in Caputzal that non-intentional conduct incur liability only where the defendant is in a position to foresee fright or shock serious enough to cause substantial injury in a person normally constituted. 48 N.J. at 76.
We understand that in Portee our Supreme Court has instructed us not to stand on arbitrary formality; rather, we should address whether defendants owed the parents a duty of reasonable care. 84 N.J. at 96. Viewed in the abstract, such admonition might militate in favor of allowing recovery to the parents in these circumstances. But it was in the context of that general policy statement that the Supreme Court stated very specifically
[t]he second requirement  that the plaintiff witness the incident which resulted in death or serious injury  is equally essential. [Id. at 99].
These requirements were no doubt established because the Court recognized that "[w]ithout adequate guidance, juries may impose liability that is not commensurate with the culpability of defendant's conduct." Id. at 96.
Plaintiffs' cause of action must be denied because of their failure to establish that they witnessed an "incident" as contemplated in the Portee requirements. Id. at 99. We do not withdraw from our holding in Polikoff, supra, but find this case distinguishable in that mere advice and failure to properly diagnose and treat does not satisfy the Portee requirement *546 of an "incident." While the viewing of the infant in his death-like state may itself be classified as an incident, we do not find it to be of the nature contemplated by the Portee Court. This is not a case such as Ochoa v. Superior Court wherein the mother, despite her urging that something be done for her child, was caused "to witness the apparent neglect of the patient's immediate medical needs by medical personnel." 39 Cal.3d 159, 165, 703 P.2d 1, 5-6, 216 Cal. Rptr. 661, 665-666 (1985). If recovery is allowed in this circumstance, a similar claim and possible recovery by perhaps the entire immediate family in nearly every medical malpractice case which ends in serious physical consequences may result.
We believe that to impose liability where the malpractice merely consists of an improper diagnosis will result in too great a cost to society and have a profoundly deleterious impact on the medical profession to the detriment of our society as a whole. Accord Jacobs v. Horton Mem. Hosp., ___ A.D.2d ___, 515 N.Y.S.2d 281 (1987). See generally Annotation, Immediacy of Observation of Injury as Affecting Right to Recover Damages for Shock or Mental Anguish from Witnessing Injury to Another, 5 A.L.R.4th 833 (1981 & Supp. 1986); Annotation, Recovery for Mental or Emotional Distress Resulting from Injury to, or Death of, Member of Plaintiff's Family Arising From Physician's or Hospital's Wrongful Conduct, 77 A.L.R.3d 447 (1977 & Supp. 1986). As stated in Caputzal, supra, 48 N.J. at 77, denial of recovery in such circumstances is often couched in terms of proximate cause, but,
[u]tilization of that term to draw judicial lines beyond which liability will not be extended is fundamentally as an instrument of fairness and policy, although the conclusion is frequently expressed in the confusing language of causation, "foreseeability" and "natural and probable consequences."
A limit must be set to liability for the consequences of a negligent act based on social considerations of justice and policy. The requirement that there be an incident witnessed by a qualified plaintiff serves that function in claims for emotional distress.
*547 We affirm the judgment in the wrongful death action and reverse and set aside the judgment for emotional distress to the parents.