239 N.J. Super. 312 (1990)
571 A.2d 318
EDWARD W. JOHNSON, EXECUTOR OF THE LAST WILL AND TESTAMENT OF AURELIA A. JOHNSON, DECEASED, AND EDWARD W. JOHNSON, INDIVIDUALLY, PLAINTIFF-APPELLANT-CROSS-RESPONDENT,
v.
THE MOUNTAINSIDE HOSPITAL, A CORPORATION, JEFFREY TRAUSE, RESPIRATORY DISEASE ASSOCIATES, JACK H. DADAIN, BARRY J. WEBER, DR. VALLARIO, PURITAN-BENNETT A CORPORATION, AND JOHN DOE MANUFACTURING COMPANY, ROBERT ROE RETAIL COMPANY, ABC REPAIR COMPANY, DEF MAINTENANCE COMPANY AND JANE FLO, DEFENDANTS-RESPONDENTS, AND LOUIS MCDONALD, SUSAN L. SIENKIEWICZ, MARY DOWD, CAROL HOULIDAY LARKIN AND BENJAMIN SAFIRSTEIN, M.D., DEFENDANTS-RESPONDENTS-CROSS-APPELLANTS.
Superior Court of New Jersey, Appellate Division.
Argued December 12, 1989.
Decided March 12, 1990.
*317 Before Judges MICHELS, DEIGHAN and BROCHIN.
Bernard Chazen argued the cause for appellant-cross-respondent (Chazen & Chazen, attorneys; Bernard Chazen, on the brief).
George J. Kenny argued the cause for respondents, The Mountainside Hospital and Jeffrey Trause (Connell, Foley & Geiser, attorneys; Ernest W. Schoellkopff, on the brief).
James P. Richardson argued the cause for respondent-cross-appellant, Louis McDonald (Sellar, Richardson, Stuart & Chisholm, attorneys; James P. Richardson and Joseph P. Vesey, Jr., on the brief).
Thomas H.E. Hallett argued the cause for respondents-cross-appellants, Susan L. Sienkiewicz, Mary Dowd and Carol Houliday Larkin (Reiseman, Mattia & Sharp, attorneys; Thomas H.E. Hallett and Francis A. Nemazie, on the brief).
Marjorie Gilman Baker argued the cause for respondents, Respiratory Disease Associates, P.A., Jack H. Dadain, M.D., Barry J. Weber, M.D. and Frank T. Vallario, M.D. (Dughi and Hewit, attorneys; Marjorie Gilman Baker and Christopher J. Christie, on the brief).
Rowena M. Duran argued the cause for respondent-cross-appellant, Benjamin Safirstein, M.D. (Hurley & Vasios, attorneys; Rowena M. Duran, on the brief).
The opinion of the court was delivered by BROCHIN, J.A.D.
Aurelia A. Johnson suffered from Guillain-Barre Syndrome. She was hospitalized on August 13, 1979 at Mountainside Hospital. Since she had trouble breathing, she was connected to a respirator by a tube connection placed in her trachea. On November 17, 1979, she was accidentally disconnected from the respirator. Serious brain damage resulted which ultimately caused her death.
*318 Plaintiff Edward M. Johnson, who was Aurelia Johnson's husband, instituted this wrongful death and survivorship action. He named as defendants Mountainside Hospital, Puritan-Bennett Corp., which had manufactured her respirator, several physicians who were alleged to have been responsible for her injury and death, and several other parties who were denominated by fictitious names. That complaint was eventually dismissed because of plaintiff's failure to comply with discovery orders,[1] but it was ultimately reinstated following an appeal to this court and a hearing before the trial court on remand. See Johnson v. Mountainside Hosp., Resp. Disease Assoc., 199 N.J. Super. 114, 488 A.2d 1029 (App.Div. 1985). Thereafter, plaintiff ultimately went to trial on his third amended complaint. In that complaint, plaintiff asserted claims against Mountainside Hospital, Puritan-Bennett Corp., four physicians and their professional corporation, the Hospital's director of cardiorespiratory services, his assistant, a respiratory therapist, two nurses, and various other defendants designated by fictitious names.
One of plaintiff's legal theories was that Mountainside Hospital was strictly liable in tort as a commercial lessor of the respirator equipment from which his wife had become disconnected and that it was not protected against that liability by the charitable immunity statute, N.J.S.A. 2A:53A-8. In advance of trial, the trial judge ruled that the Hospital was not liable to plaintiff under that legal theory.
Plaintiff settled its claim against Puritan-Bennett and the remainder of the case was tried to a jury. At the close of plaintiff's case, the judge dismissed the action against Dr. Benjamin Safirstein, the medical director of the Hospital's respiratory therapy department, Louis McDonald, a respiratory therapist who was the head of the respiratory therapy department, *319 and Jeffrey Trause, Mr. McDonald's assistant. The jury found that Puritan-Bennett was 80 percent negligent and Mountainside Hospital 20 percent. It awarded plaintiff $25,000 for decedent's pain and suffering and $456,250 for the pecuniary damage sustained by her survivors, and it returned verdicts of no cause for action in favor of all of the other defendants.
If Mountainside Hospital were liable for its 20 percent share of the total jury verdict, it would have been subject to a judgment for $96,250. However, because of the limit on its liability conferred by the charitable immunity statute, N.J.S.A. 2A:53A-8, the amount of the judgment against the Hospital was limited to $10,000.[2]
On appeal, plaintiff alleges that Mountainside Hospital is not entitled to the charitable immunity defense and that the *320 defense itself is unconstitutional. His argument for the inapplicability of the charitable immunity defense is that plaintiff's decedent was not the beneficiary of charity because her care was paid for by medical insurance. His constitutional argument is that the charitable immunity legislation, at least as applied to hospitals, is special legislation and violates the due process and equal protection clauses of the federal constitution and the comparable protections of the New Jersey constitution.
We reject these arguments and hold that the charitable immunity legislation is constitutional and that Mountainside Hospital is entitled to rely on it to limit its liability to plaintiff to $10,000. The constitutionality of the charitable immunity legislation, which has been part of our statutory law for more than thirty years, is now well settled. See Edwards v. Our Lady Of Lourdes Hosp., 217 N.J. Super. 448, 526 A.2d 242 (App.Div. 1987); Makar v. St. Nicholas etc. Church, 78 N.J. Super. 1, 3-8, 187 A.2d 353 (App.Div. 1963).
We also disagree with plaintiff's contention that, because of medical insurance, his decedent was not "a beneficiary, to whatever degree, of the works of" Mountainside Hospital, a "non-profit corporation." That argument, if valid, would exempt every plaintiff except the medically indigent from the bar of the charitable immunity legislation. The decided cases which have applied the charitable immunity statute in favor of non-profit hospitals, and of other types of non-profit corporations organized for other charitable purposes, have implicitly rejected that argument, and we now do so explicitly. Cf. Vitolo v. St. Peter's Church, 118 N.J. Super. 35, 37, 285 A.2d 570 (App.Div.), certif. den. 60 N.J. 285, 288 A.2d 27 (1972), where this court recognized that the fact of insurance does not change the impact of the immunity statute or confer additional rights upon an injured beneficiary. Although reimbursed by insurance and government programs for the cost of its services, non-profit hospitals continue to perform a vital, benevolent social function, and every user of such a hospital is a beneficiary of its works.
*321 We also disagree with plaintiff's contention that his claim for relief against Mountainside Hospital was properly predicated upon a strict liability theory and, for that reason, the $10,000 limit on its liability was inapplicable. Cf. Brody v. Overlook Hospital, 121 N.J. Super. 299, 296 A.2d 668 (Law Div. 1972), rev'd on other grounds, 127 N.J. Super. 331, 317 A.2d 392 (App.Div. 1974), aff'd, 66 N.J. 448, 332 A.2d 596 (1975). Although there was evidence in the case showing that Mountainside Hospital charged a rental fee for the respirator, the trial judge held that the Hospital was in the business of providing health care to patients and therefore could not be treated as a lessor of equipment to whom strict legal liability applied. We agree. Our courts have refused to impose strict liability on health care providers. Brody v. Overlook Hospital, supra, 66 N.J. 448, 332 A.2d 596 (1975); Baptista v. Saint Barnabas Medical Center, 109 N.J. Super. 217, 262 A.2d 902 (App.Div. 1970), aff'd o.b. 57 N.J. 167, 270 A.2d 409; Newmark v. Gimbel's, Inc., 54 N.J. 585, 258 A.2d 697 (1969); Magrine v. Krasnica, 94 N.J. Super. 228, 227 A.2d 539 (Cty.Ct. 1967), aff'd, 100 N.J. Super. 223, 241 A.2d 637 (App.Div. 1968), aff'd, 53 N.J. 259, 250 A.2d 129 (1969). In Feldman v. Lederle Laboratories, 97 N.J. 429, 442, 479 A.2d 374 (1984), the Supreme Court stated:
... When the essential nature of the transaction involves a service rather than a product, public policy may dictate, in view of the status of the provider, that the general welfare is served better by inapplicability of the strict liability doctrine. Further, when the provider is a nonprofit institution that supplies a product and that product is vital to the public health, the doctrine may similarly be inapplicable. The common thread that runs through these cases is that in each of those situations there is a strong public policy rooted in the general welfare that justifies imposing responsibility only on the basis of a want of due care (negligence) rather than on the basis of a defective product (strict liability). Cf. Baptista v. Saint Barnabas Medical Center, 109 N.J. Super. supra, at 224 [262 A.2d 902].
The policy of these cases is applicable to the present case and supports the trial judge's decision that plaintiff cannot prevail against the hospital on the basis of a theory of strict liability.
Defendants Jack H. Dadain, M.D., Barry J. Weber, M.D. and Frank T. Vallario, M.D., who were members of defendant *322 Respiratory Disease Associates, their professional corporation, are specialists in pulmonary medicine and are members of the pulmonary division of the medical staff of Mountainside Hospital. They were consulted by Mrs. Johnson's attending physician and they were responsible for monitoring her condition during the course of her stay in the Hospital. Plaintiff argues that a jury could have found that Mrs. Johnson suffered the injury from which she ultimately died because of someone's negligence in turning off the alarm which would otherwise have warned attending personnel when the respirator became disconnected. Plaintiff contends that these defendant physicians should have anticipated that sort of negligence and are liable because they failed to take reasonable steps to protect Mrs. Johnson against its consequences. Plaintiff challenges the trial judge's refusal to charge the jury in accordance with that theory.
This court has rejected plaintiff's theory, referred to in other jurisdictions as the "captain of the ship" doctrine. Sesselman v. Muhlenberg Hospital, 124 N.J. Super. 285, 290, 306 A.2d 474 (App.Div. 1973). We are unwilling to depart from the rule of that case. Accordingly, we agree with the trial court's refusal to charge on this issue as requested by plaintiff.
While Dr. Dadain was being cross-examined, he was asked to read portions of the by-laws of Mountainside Hospital. Complying with plaintiff's attorney's request, he read a provision which stated that one of the purposes of the by-laws was "to insure that all the patients ... treated at Mountainside Hospital shall receive the best possible care." The witness was then asked whether "the standard set by the by-laws for the practice of medicine in Mountainside Hospital is the best possible care." The question was objected to and the objection sustained. However, the court advised plaintiff's counsel that he could ask the witness substantially the same question if there was no reference to "standards." Dr. Dadain was then asked:

*323 "In performing your duties as a member of the staff... did you try to insure that patients received the best possible care?"
The doctor responded that he did. Plaintiff now alleges that the court's ruling which precluded him from asking the witness whether the by-law established the standard for the staff's practice of medicine was error.
We agree with the trial judge's refusal to permit plaintiff to ask the question objected to. It was potentially misleading because it attempted to exalt an exhortatory statement in the by-laws of the Hospital into the legal standard for determining whether or not the defendant physicians committed malpractice. The relevant legal standard is defined by law. The duty of a physician is to "exercise in the treatment of his patient the degree of care, knowledge and skill ordinarily possessed and exercised in similar situations by the average member of the profession practicing in his field." Schueler v. Strelinger, 43 N.J. 330, 344, 204 A.2d 577 (1964).
During the course of the direct examination of a physician who was plaintiff's expert on respiratory therapy, the witness was asked to identify the 1979 edition of the accreditation manual for hospitals. He identified it as "a document that lays out the organization and the general standards that hospitals must meet in order to be accredited by this particular organization and function in the United States." He continued:
This document lays out the standards and then a group of experts, physicians, nurses, administrators and experts in other areas come and survey the hospital and see whether or not the hospitals are organized according to these particular standards. It's a document that charges the hospital with maintaining the appropriate standard for quality of care but that particular organization does not, in itself, look at the individual medical therapy of particular patients. That's usually left to either state organizations or more commonly hospital organizations that monitor what happens to patients.
Plaintiff's counsel sought to read the following provision of the manual into the record:
Standard IV. The medical staff shall provide mechanisms for the regular monitoring of medical staff practice and functions. Such mechanisms shall be designed to maintain high professional standards of care.

*324 Patient Care Evaluation. Because the overall responsibility for the quality of medical practice rests with the medical staff, the individual staff members must be held accountable for appropriateness of care rendered to their patients.
The evaluation of patient care shall be performed through utilization review, audit activities, and the mechanism established by the medical staff for the monitoring of its practice. Each of these shall be performed on a regular basis....
There shall be continuous monitoring, with enforcement, of those elements of patient care identified in the medical staff or clinical department/service rules and regulations....
The court permitted these provisions to be read to the jury, but only with the limiting instruction that the standard was applicable only against the Hospital and not against the defendant physicians. Plaintiff now argues that this ruling was error.
We disagree. The trial court's ruling was based upon two grounds. It held, first of all, that the quoted excerpt from the manual of the joint committee on accreditation of hospitals was directed to the hospital and not to the staff physicians. Secondly, the court held that plaintiff had not shown the relevance of the excerpt to his claims against the physicians. We agree with both grounds. Plaintiff has not pointed to any foundation evidence which tends to establish that the excerpt was intended to create a standard of conduct which would serve as a criterion of whether or not the defendant physicians departed from accepted medical practice. Also, plaintiff did not show, either in his argument to the trial court or in his argument to us, that the standard was relevant. He did not point to or proffer any evidence tending to show any specific conduct of the defendant physicians which was contrary to the standards contained in the manual.
Plaintiff also objects to the trial judge's refusal to permit him to introduce certain parts of the state administrative code into evidence against the defendant physicians. The provisions of the administrative code which he wanted to introduce read in part:

*325 (1) The medical staff shall ensure clinical practice of the highest quality and each individual staff member shall be accountable for the appropriateness of care rendered to his patients....[N.J.A.C. 8:43B-6.1(a)1.]
The court held that the quoted regulation stated an objective or aspiration and not a standard of care, deviation from which would constitute medical malpractice. On that premise, it held that the regulation was irrelevant and therefore inadmissible. We agree.
Plaintiff was of the view that at trial defendants sought to cast the entire blame for the tragic disconnection of Mrs. Johnson's respirator upon the Hospital itself. If successful, that tactic would shield the individual defendants, whose potential liabilities, unlike that of the hospital, were unlimited. To counteract that tactic, plaintiff requested the trial judge to instruct the jury that if the hospital was negligent, plaintiff's recovery against it would be limited to $10,000. The trial judge declined to charge as requested. Plaintiff argues that this ruling was error.
If the requested instruction was to have any effect upon a jury's verdict, it could only be to persuade the jury to shift to the other defendants some amount for which it had concluded the hospital, and not the other defendants, was justly responsible. By the enactment of N.J.S.A. 2A:53A-8, the legislature determined that, as a matter of social policy, an injured beneficiary of the hospital's works, can shift only a limited share of the consequences of the hospital's negligence to the hospital itself. But there is no reason to believe that a purpose of the statute was to shift any part of those consequences to other parties merely because they happen to be caught up in the same law suit as the hospital. We agree with the trial judge that a charge leading to that result would be unfair and inappropriate. In that respect, we think that the situation presented by this case is different from situations in which an ultimate outcome charge has been held to be required. See Roman v. Mitchell, 82 N.J. 336, 345-347, 413 A.2d 322 (1980); *326 Dimogerondakis v. Dimogerondakis, 197 N.J. Super. 518, 485 A.2d 338 (Law Div. 1984).[3]
Among the defendants are nurse Mary Dowd, nurse Carol Larkin and respiratory therapist Susan L. Sienkiewicz. On the day of Mrs. Johnson's death, nurse Dowd saw her hourly between 8:00 a.m. and 3:00 p.m. Nurse Larkin cared for her at 2:00 p.m., although her shift was not scheduled to begin until 4:00 p.m. Respiratory therapist technician Sienkiewicz checked the respirator alarm at 2:15 p.m. At 3:50 p.m., nurse Larkin passed by Mrs. Johnson's room, noticed that her color was pale and found that she had been disconnected from the respirator and that the alarm had been shut off. On the basis of these facts, the plaintiff asked the court to charge that if the respirator alarm had been negligently inactivated by either Dowd, or Larkin or Sienkiewicz, but the jury was unable to determine who among those persons had actually turned it off or failed to turn it on, then the burden shifted to each of those defendants to prove that she was not responsible. In support of that request to charge, plaintiff relies on Anderson v. Somberg, 67 N.J. 291, 338 A.2d 1 (1975), cert. den. 423 U.S. 929, 96 S.Ct. 279, 46 L.Ed.2d 258 (1975); Tierney by Tierney v. St. Michaels, 214 N.J. Super. 27, 518 A.2d 242 (App.Div.), certif. den. 107 N.J. 114, 526 A.2d 184 (1986) and Tisdale v. Fields, 183 N.J. Super. 8, 443 A.2d 211 (App.Div. 1982). The trial court held that those cases were inapplicable and declined to give the requested instruction.
We hold that the trial court's ruling was correct. The premise of the ruling in each of these cases was that, more probably *327 than not, the mishap had occurred as the result of the negligence of one of the defendants. In the present case, there was no basis for the jury to have found that the failure of the respirator alarm was probably the result of the negligence of one of these three defendants. Other hospital personnel, including physicians, resident nurses, therapists, members of the housekeeping department and visitors, all had unrestricted access to Mrs. Johnson's room. There was evidence that residents were changing respirator settings without documenting those changes in the patient's chart. The jury could also reasonably have concluded that the manufacturer of the respirator was responsible for the failure of the alarm to sound. Because the evidence did not provide a sufficient basis for the jury to have found that that failure was caused by the negligence of at least one among defendants Sienkiewicz, Larkin or Dowd, Anderson v. Somberg, supra, and the cases that followed it are not authority for requiring them to disprove their own negligence.
At the close of plaintiff's case, the trial court dismissed plaintiff's complaint against defendants Safirstein and McDonald. On appeal, plaintiff contends that those rulings were error. However, plaintiff has failed to point to any evidence that either of these defendants breached any duty of care which he had to Mrs. Johnson. In the absence of evidence tending to establish a breach of such a duty of care, the trial judge's rulings were correct.
Plaintiff contends that he was entitled to damages for the emotional distress which Mrs. Johnson's family suffered as the result of seeing her in a comatose state from the time that the respirator was disconnected until she died. However, the Supreme Court has ruled that a bystander may not recover damages for emotional distress unless he has been present and has observed the actual injury inflicted on a member of his family. Portee v. Jaffee, 84 N.J. 88, 417 A.2d 521 (1980); Frame v. Kothari, 218 N.J. Super. 537, 543-545, 528 A.2d 86 *328 (App.Div. 1987), aff'd, 115 N.J. 638, 560 A.2d 675 (1989). The trial court was bound by this ruling and so are we.
Plaintiff also contended before the trial court, and argues here, that loss of his sexual relationship with his wife was a separately compensable element of damages. He bases his claim on the fact that loss of the sexual relationship is a recognized element of damages in a husband's per quod action for tortious injury to his wife. See Zalewski v. Gallagher, 150 N.J. Super. 360, 372, 375 A.2d 1195 (App.Div. 1977). However, the present suit is not a per quod action but an action under the wrongful death act, N.J.S.A. 2A:31-1 and following, which states:
... [T]he jury may give such damages as they shall deem fair and just with reference to the pecuniary injuries resulting from such death together with the hospital, medical and funeral expenses incurred for the deceased, to the persons entitled to any intestate personal property of the decedent [N.J.S.A. 2A:31-5]
Permitting recovery in a wrongful death action for loss of the sexual relationship would require an extension of present New Jersey law. Cf. Green v. Bittner, 85 N.J. 1, 424 A.2d 210 (1980). Whatever may be the merits of plaintiff's argument on this issue, we do not think that this is an appropriate case in which to consider such an extension. Even if the trial court had charged as requested by the plaintiff, there could have been no effect on the judgment. Plaintiff recovered a verdict only against Mountainside Hospital. Even if the jury had increased its verdict against the Hospital to compensate for loss of the sexual relationship, plaintiff could still have recovered no more than $10,000 principal together with interest only on that $10,000. Marsella v. Monmouth Medical Center, 224 N.J. Super. 336, 340-342, 540 A.2d 865 (App.Div. 1988). The issue is *329 therefore moot because it has no practical consequences for this case.
During the direct examination of Dr. Pinsker, plaintiff attempted to introduce into evidence a publication entitled "The Management Of Patient-Ventilator System: A Team Approach." The trial court held that under New Jersey law, learned treatises are hearsay and inadmissible to prove the opinions which they contain. This ruling was clearly correct. McComish v. DeSoi, 42 N.J. 274, 281, 200 A.2d 116 (1964); Ruth v. Fenchel, 21 N.J. 171, 176, 121 A.2d 373 (1956).
Finally, plaintiff contends that the trial judge erroneously denied him the right to additional peremptory challenges. He argued to the trial judge that because there were five defense lawyers, the defendants would have five times as many challenges as he. He therefore asked for six more challenges, the number which the judge had given the plaintiff in George v. Bergen Pines Cty. Hosp., 217 N.J. Super. 548, 526 A.2d 293 (Law Div. 1987). The court declined to follow that case, holding that the applicable court rule permitted no discretion. At the time of that ruling, R. 1:8-3(c) read:
... In civil actions each party shall be entitled to 6 peremptory challenges. Parties represented by the same attorney shall be deemed 1 party for the purposes of this rule.
Effective January 1989, a sentence was added to this rule which reads as follows:
Where, however, multiple parties having a substantial identity of interest in one or more issues are represented by different attorneys, the trial court in its discretion may, on application of counsel prior to the selection of the jury, accord the adverse party such additional number of peremptory challenges as it deems appropriate in order to avoid unfairness to the adverse party.
Since that sentence was not part of the rule when plaintiff applied for additional peremptory challenges, the trial court was correct in holding that it did not have the discretion to grant the application.
Defendants Safirstein, McDonald, Sienkiewicz, Dowd and Larkin have cross-appealed, challenging various rulings by the *330 trial court. However, since we have affirmed the trial court's dismissal of the claim against defendants Safirstein and McDonald and its entry of a judgment on the jury's verdict in favor of Seinkiewicz, Dowd and Larkin, their cross-appeals are moot.
The judgment appealed from is therefore affirmed in all respects.
NOTES
[1] Plaintiff was then represented by attorneys other than those who are currently representing him.
[2] The charitable immunity for non-profit hospitals is contained in N.J.S.A. 2A:53A-7 and N.J.S.A. 2A:53A-8. They read as follows:

N.J.S.A. 2A:53A-7. No nonprofit corporation, society or association organized exclusively for religious, charitable, educational or hospital purposes shall, except as is hereinafter set forth, be liable to respond in damages to any person who shall suffer damage from the negligence of any agent or servant of such corporation, society or association, where such person is a beneficiary, to whatever degree, of the works of such nonprofit corporation, society or association; provided, however, that such immunity from liability shall not extend to any person who shall suffer damage from the negligence of such corporation, society, or association or of its agents or servants where such person is one unconcerned in and unrelated to and outside of the benefactions of such corporation, society or association; but nothing herein contained shall be deemed to exempt the said agent or servant individually from their liability for any such negligence.
N.J.S.A. 2A:53A-8. Notwithstanding the provisions of the foregoing paragraph any nonprofit corporation, society or association organized exclusively for hospital purposes shall be liable to respond in damages to such beneficiary who shall suffer damage from the negligence of such corporation, society or association or of its agents or servants to an amount not exceeding $10,000.00, together with interest and costs of suit, as the result of any 1 accident and to the extent to which such damage, together with interest and costs of suit, shall exceed the sum of $10,000.00 such nonprofit corporation, society or association organized exclusively for hospital purposes shall not be liable therefor.
[3] There is a special reason why an ultimate outcome charge is required in a case in which the jury is asked to find the comparative negligence of several defendants. The comparataive negligence law requires the jury to express the relative culpability of the defendants in terms of percentages. That form of expression is really only a metaphor. In order to understand how to convert its views of the defendants' relative culpabilities into percentages, the jury must understand, as much as possible, about how their metaphoric expression will operate.