711 A.2d 321 (1998)
312 N.J. Super. 20
JILL DIAKAMOPOULOS, as Administrator Ad Prosequendum for the Heirs-at-Law of Basilica Diakamopoulos, Deceased; Theodoros Diakamopoulos; Jill Diakamopoulos, Plaintiffs-Respondents,
v.
MONMOUTH MEDICAL CENTER; Tamara McClusky, M.D.; Those John or Jane Doe Persons or Entities Treating or Failing to Treat the Deceased Basilica Diakamopoulos and whose Negligence Contributed to the Cause of Her Death, Defendants, and
Dr. Rosemary Fernandez, Defendant-Appellant.
Superior Court of New Jersey, Appellate Division.
Argued February 3, 1998.
Decided May 21, 1998
*322 Patrick H. Cahalane, Tinton Falls, for defendant-appellant (Ronan, Tuzzio, Giannone & McGuire, attorneys; Mr. Cahalane, of counsel and on the brief).
Paul A. Stamoulis, Hazlet, for plaintiffs-respondents.
Before Judges CONLEY, WALLACE and CARCHMAN.
The opinion of the court was delivered by
CARCHMAN, J.S.C. (temporarily assigned).
This is a medical malpractice action. Plaintiff Jill Diakamopoulos, as administrator ad prosequendum for the Heirs-at-Law of Basilica Diakamopoulos, deceased, and Jill *323 Diakamopoulos and Theodoros Diakamopoulos, individually,[1] filed this action against defendants Dr. Rosemary Fernandez (Dr. Fernandez), Tamara McCluskey, M.D. and Monmouth Medical Center (Medical Center) alleging that the death of four-month old Basilica was caused by the refusal of defendants to treat her. The case was tried before a jury which awarded a verdict of $400,000 against Dr. Fernandez.[2] On appeal, Dr. Fernandez asserts multiple errors in the trial including, among other claims, an improper reference to her resignation from the hospital staff; improper introduction during plaintiff's counsel's summation of "evidence" not elicited at trial; and improper references during the course of the trial by plaintiff's counsel to "captain of the ship," a legal theory previously rejected by our courts. Because we conclude that there were multiple and cumulative errors throughout this trial which were clearly capable of producing an unjust result, R. 2:10-2, we reverse and remand for a new trial.

I.
In the fall of 1989, plaintiff, who is learning disabled, contacted the Outpatient Clinic of the Medical Center (clinic) and scheduled a regular "well-baby" appointment on November 29, 1989 for her four-month old daughter Basilica. However, on November 19, 1989, ten days before her "well-baby" check-up, Basilica became ill. She suffered from diarrhea and vomiting, and as a result, plaintiff contacted the emergency room of the Medical Center requesting that Basilica be examined. Plaintiff spoke to Dr. McClusky who asked about Basilica's symptoms and then told plaintiff to bring the infant to the emergency room.
In the emergency room, Dr. McClusky examined the infant, drew blood for testing, discharged her and scheduled a follow-up visit for November 21, 1989 at the clinic. On November 21, Dr. McClusky again examined the infant, noted she had lost four ounces since the November 19 visit and told plaintiff to keep the regularly scheduled November 29, 1989 appointment.
Plaintiff asserted that Dr. McClusky told her not to call her or the clinic unless Basilica's temperature reached 105 degrees and recalled that during the November 21 visit, she informed Dr. McClusky that Basilica was still vomiting and having diarrhea. Plaintiff did not call Dr. McClusky or the clinic between November 21 and November 29 because, although Basilica's symptoms continued, her temperature never reached 105 degrees.
On November 29, 1989, the scheduled date for Basilica's regular appointment, plaintiff telephoned the clinic and inquired whether she could delay the appointment and bring in Basilica and her sister, Eleni, with their other sister, Christina, who had a scheduled appointment the next day, November 30, 1989. Plaintiff requested this change because of inclement weather on November 29 and her necessity to use a bus for transportation. A receptionist at the clinic told plaintiff that she could bring in all three children on November 30.
The rescheduling was approved and specifically noted in the clinic's appointment calendar. On November 30, 1989, plaintiff appeared at the hospital with her three children, Basilica, Eleni and Christina. In the examining room, Dr. Fernandez examined Eleni and Christina. Plaintiff insists that, following Dr. Fernandez's examination of Eleni and Christina, she requested that the doctor examine Basilica, explaining to Dr. Fernandez that the infant was ill and had an eleven-day history of vomiting and diarrhea. Despite plaintiff's protestation that she had scheduled an appointment for Basilica, she asserts that Dr. Fernandez refused to examine the infant. Plaintiff claims Dr. Fernandez cited a clinic policy that "no three children from the same family could be examined during one visit." Plaintiff testified that Dr. Fernandez stated "[w]hy does she need to be seen if she's only just been seen nine days ago?"
*324 Plaintiff informed Dr. Fernandez that she (plaintiff) was developmentally delayed and Dr. Fernandez had indicated her knowledge of this in the medical record of Eleni, dated November 30, 1989.
Within forty-eight hours of the November 30 clinic visit, tragedy ensued as Basilica died. Her death was attributed to dehydration, pneumonia and septicemia leading to cardiac arrest. She had lost approximately twenty-three percent of her total body weight since her last weighing at the clinic on November 21, 1989.
At trial, plaintiff's expert, Dr. Norman Schell, M.D. sharply criticized Dr. Fernandez's failure to examine Basilica on November 30, 1989. Dr. Schell opined that at the time of the office visit with Dr. Fernandez on November 30, 1989, the infant had pneumonia; that the infant was dehydrated and debilitated; that this condition would have been detected by Dr. Fernandez had the infant been examined by her; and that all the organisms present in the infant were common ones, easily treatable with antibiotics in accordance with standard medical practice. According to Dr. Schell, a pediatrician and infectious disease expert, if an examination had been performed on November 30, Basilica's pneumonia would have been detected and treated, probably preventing the infant's death.
Dr. Fernandez presented a different factual scenario. She denied refusing to see Basilica during the November 30, 1989 office visit noting that at the time of the November 30 visit, she was not aware of the clinic's "no three siblings in one visit" policy. Her position was that while the clinic appointment book indicated a scheduled appointment for Basilica on November 30, 1989, this was a clerical error on the part of the clinical staff. Moreover, the doctors do not rely on the list but on the charts "pulled" for them. No chart was pulled for Basilica.
Dr. Fernandez's expert, Dr. Angelo Scotti, offered evidence purporting to establish that Basilica had gastroenteritis on November 19, 1989 that was resolved by the clinic visit of November 21, 1989. Dr. Scotti opined that Basilica was essentially healthy from November 21 until November 30 or December 1. At that time, Dr. Scotti asserts that Basilica acquired a devastatingly rapid bacterial infection, most likely through aspiration, resulting in bacterial pneumonia, which ultimately led to septicemia, the cause of death. Dr. Scotti concluded that there was no way to state with certainty that defendant Dr. Fernandez would have discovered the sickness that caused Basilica's death had she examined her on November 30.
During discovery, plaintiff sought the Medical Center's records regarding the termination of Dr. Fernandez as a resident. On a motion to bar production of the documents, the motion judge granted the Medical Center's application except as to two portions of the record. The statements produced first described conduct attributed to Dr. Fernandez:
A number of our attending staff described your making chart entries of physical findings when you had not performed those aspects of the physical examine [sic].
and then her response:
She [Fernandez] agreed it was a mistake and she has not repeated this matter.
Nothing in the comments related to Basilica, but the motion judge left for the trial judge the issue of use of this information at trial. As to the balance of the documents in Dr. Fernandez's personnel file, the motion judge commented:
The Court reviewed that whichI'm just going to take a guesstimate which appears to be about maybe 150 to 200 pages last night. I did not see in there any documents, any statements, anything at all directly or indirectly related to the lawsuit relating to the infant child, Diakamopoulos. ...
....
And therefore, I am not going to order that those documents be made available to you, with relating this case.
The only exception to that was in a report by a supervisor to Dr. Fernandez dated January 23rd, 1990, and there is a reply by Dr. Fernandez, to a statement in that report, at her hearing on whether she would be renewed or not, of May 1, 1990, which related to Dr. Fernandez placing *325 into a chart a notation relating to an examination of a head, eye, ear, nose and throat child, when in fact she may not have in fact made that examination or, made the entry before the examination itself was performed.

[Emphasis added]
At trial, defendants successfully moved to have these two remaining statements excluded from trial. In ruling the statement inadmissible, the trial judge stated:
Okay. You can only fine tune a case so much but this cries out for some fine tuning. Number one, you have a jury sitting here who's going to be deciding whether or not on a prior time the doctor made a charting error and agreed that she made a mistake. So right off the bat you're talking issues of relevancy, has absolute nothing to do with this case at all.

Prior bad conduct cannot be used to show bad conduct here or malpractice here. And despite counsel's assertions,... that's exactly why it's being offered, to show that the prior bad conduct has a tendency to repeat itself and therefore that's what must have happened here, leading to jury speculation.
I think it's admissible. I think it's irrelevant and if I'm wrong, I'm going to exercise my discretion under Rule 403 to exclude it, even if it can be deemed by another Court to be relevant. Why? Because it's going to lead to a trial within a trial.
The jury would have a tendency to be confused by the prior bad act. It would lead the jury to inappropriate speculation and again, not to repeat, but if another Court disagrees with my decisions with respect to relevancy, I'm going to exercise my trial discretion to exclude it as confusing to the jury. That's always within the discretionary powers of the trial Judge.
It's too collateral to the issues here in this case and it's going to lead, as I said before, to a trial within a trial. And we're going to be talking about that prior mistake more than what happened in this case.... I'm not going to permit it.

[Emphasis added]
Despite the trial judge's explicit ruling that the statements were inadmissible, and the motion judge's order that the statements, and impliedly Dr. Fernandez's termination, were not related to the lawsuit, the following exchange took place during plaintiff's counsel's questioning of Dr. Fernandez:
PLAINTIFF'S COUNSEL: Okay. Doctor, shortly after this incident, you were asked to resign from the hospital by Dr. Fox, were you not? (emphasis added)
DEFENSE COUNSEL: Note my objection, Your Honor. Side bar.
THE COURT: Let's go. (side bar conference)
THE COURT: I've already ruled on this.
PLAINTIFF'S COUNSEL: No, no, no, no. This, wait a minute. She admitted this during the deposition.
THE COURT: No.
PLAINTIFF'S COUNSEL: This is not information that was,
THE COURT: It doesn't matter. I'm sustaining the objection.
DEFENSE COUNSEL: I want a direction, Your Honor, to the jury.
THE COURT: You're going to have it.
DEFENSE COUNSEL: And I'll bid for a mistrial on the record.
THE COURT: It's denied. I'm going to cure it.
PLAINTIFF'S COUNSEL: Your Honor, this was, she doesn't deny it. I mean, this is not, this is
THE COURT: I'm sorry
PLAINTIFF'S COUNSEL: It's
THE COURT: I'm not permitting it.
PLAINTIFF'S COUNSEL: This is to be distinguished from this case.
THE COURT: Excuse me?
PLAINTIFF'S COUNSEL: This is to be distinguished from the information that was reviewed in camera, where there was statement in her personnel file about a misrepresentation.
THE COURT: It doesn't matter.
DEFENSE COUNSEL: This is judge.
*326 THE COURT: I agree.
DEFENSE COUNSEL: It has nothing to do with the underlying case.
THE COURT: I agree.
DEFENSE COUNSEL: Absolutely nothing. It's prejudicial. The credibility of my client is essential in this case. And he just put it in jeopardy with an old allegation of nothing and he knew that, Judge.
THE COURT: I will cure it. So the application for a mistrial is denied.
PLAINTIFF'S COUNSEL: What is the objection, the relevance?
DEFENSE COUNSEL: The objection is
THE COURT: It doesn't matter what the objection is. I'm ruling it's inadmissible.
PLAINTIFF'S COUNSEL: Okay. (End of side bar conference)

[Emphasis added]
Dr. Fernandez argues that the unfair prejudice to her resulting from the questioning of plaintiff's counsel warranted a mistrial. Plaintiff asserts that the questioning should have been permitted because Dr. Fernandez's explanation during her deposition regarding her termination (personality conflicts) was allegedly inconsistent with the statements from Dr. Fernandez's personnel file deemed discoverable by the motion judge.
Despite plaintiff's suggestion that there was a conflict with a deposition and the portion of the personnel file deemed discoverable, the trial judge had previously ruled that the discoverable portion was not admissible. Plaintiff's argument relies on the discoverable portion of the personnel file. The phrasing of the question eliminates any doubt in our mind that the inquiries about Dr. Fernandez's resignation would lead to a further inquiry about her prior charting deficiencies, an issue unrelated to this case. Moreover, nothing in the record demonstrates or even suggests that the improper charting was related to Dr. Fernandez's resignation.
While there was an abundance of expert testimony at trial, the issues before the jury were classiccredibility; whether plaintiff or defendant was telling the truth; that is, did plaintiff request defendant to examine Basilica and did defendant refuse to do so. By his question, plaintiff's counsel sought to insinuate into this case an irrelevant but prejudicial elementthe termination of defendant from the residency program. Even the introductory manner in which the question was phrased"Shortly after this incident ..." was designed to suggest a nexus between the incident and the termination; a prejudicial circumstance which plaintiff could not prove.
The trial judge reacted and advised the jury:
I'm telling you ladies and gentlemen, to disregard that question. And draw no negative inference from it. Thank you.
While the trial judge's curative instruction attempted to remedy plaintiff's misconduct, it did not go far enough.
In Tomeo v. Northern Valley Swim Club, 201 N.J.Super. 416, 421, 493 A.2d 544 (App. Div.1985), we instructed trial judges on the proper course to be followed where a curative charge is necessitated by of a misstatement of fact. We commented:
When the jury learns of a fact known to be false which is irrelevant to the issues being tried but has the clear capacity to turn them for or against a party, the jury must be told the truth promptly and cautioned that the fact is not to be considered in their deliberations. If, however, the judge concludes that a cautionary instruction will not overcome the prejudicial effect of telling the jury the truth, he must declare a mistrial.

[Id. at 421, 493 A.2d 544.]
Even though, as in Tomeo, counsel did not overtly state a fact, the phrasing of the question on cross-examination assumed a fact which was in error, could not be proven and had been barred. The curative instruction in such cases must comport with Tomeo or, even in the absence of the true fact, so neutralize the assumed fact as to render the assumed fact harmless. This was not done here.
*327 Following the trial, defendant moved for a new trial, but the application was denied. The trial judge acknowledged:
Defendant alleges that plaintiff wrongfully interjected Dr. Fernandez's termination from the hospital as an issue before the jury completely negating her credibility and preventing the jury from adjudicating the issue of negligence.
Defendant's counsel correctly states that he had moved to have this issue removed from the trial. The hospital's decision not to renew her resident contract was precluded by the Court. And counsel for plaintiff wrongfully interjected it in front of the jury and disregarded the Court's directive and therefore prejudicing severely, Dr. Fernandez's case. In fact, Dr. Fernandez was found negligent.
He then went on to state his reason for denying defendants' motion:
An immediate cure was given to the jury. The jury was told, immediately, to disregard the question, I don't think an answer ever was elicited and the question, although improper, was immediately the topic of a jury instruction. No information was provided to the jury with respect to the facts surrounding Dr. Fernandez's leaving the hospital.
Although that gives rise to possible negative inference or jury speculation, having sat as the trial judge, I believe such negative inference and speculation was effectively thwarted by my rather strong and immediate admonition to the jury, to disregard the question itself.
The jury, therefore, never learned of a fact known to be untrue. And under the circumstances of this case, I find no miscarriage of justice to warrant the grant of a new trial.
Where, as here, the sole issue is credibility, the trial judge must be sensitive to those matters which may ultimately impact on the critical issue before the jury. The fact that the question was never answered here was not dispositive. The nature and phrasing of the question was. It was a leading question containing the prejudicial fact and providing the inferred nexus that somehow Dr. Fernandez's termination was related to this incident.
As we previously noted, the trial court's curative instruction did not go for enough. See, e.g., Demers v. Snyder, 282 N.J.Super. 50, 57, 659 A.2d 495 (App.Div.1995). The curative instruction required a fuller explanation of the subject and a negation of the obvious inference created.

II.
During his summation, plaintiff's counsel read passages from the deposition transcript of defendant's expert witness, Angelo Scotti, M.D.
Dr. Scotti's deposition, page 26.["]Would you administer a DPT shot to a child with a viral infection?["] ["]Sure. It depends on how sick the child is.["] So that's the question here. How sick is the child? Okay? How sick is the child? That's the question here you have to determine.
....
Q "The organisms aside, would you characterize this child as healthy up to November 30th?
A No. She was sick, obviously, on the 19th and the 21st. You know, she had some kind of illness. She had, I presume, either a viral gastroenteritis and she probably had a fungal infection, you know, a fungal. She had a rash, it sounds like from his description, like a fungal dermatitis."
However, these excerpts read to the jury during summation were never introduced as evidence during trial. Therefore, defense counsel objected to the reading of this deposition testimony for the first time in summation.
DEFENSE COUNSEL: Judge, excuse me. We're not going to read from expert deposition testimony to the jury at closing argument. I hope not.
THE COURT: Not unless it was part of the case by means of reading.
After summation, plaintiff's counsel admitted to introducing the deposition testimony of Dr. Scotti for the first time in summation. Strangely, plaintiff's counsel sought a curative *328 instruction from the trial judge, but the request was denied.
PLAINTIFF'S COUNSEL: Your honor, counsel made an objection to my [summation] opening, that I had been reading in a portion of a transcript that was not permissible. I think Your Honor
THE COURT: I let you do it. I'm not going to mention it. The point made was not even in contest. I'm ignoring it. Plus, I let you do it.
PLAINTIFF'S COUNSEL: I understand that. I think so far this trial has been a nice, clean trial. I don't want any grounds for appeal if I can avoid them.
THE COURT: Well, at this point all I want to do is charge the jury.
PLAINTIFF'S COUNSEL: I understands, but before we do that, I also would have liked to have reviewed the transcript in this matter to see, but my notes could be interpreted as going either way, whether I read that specific portion of the transcript on direct.
THE COURT: It's a non-issue. I've let you do it. I'll take the weight for it and I'm not going to mention it. The issue that you brought to the attention of the jury was really not a contested issue, so I let it go. I know counsel objected, but in view of the limited reading, I just let it go in and I'm not going to draw attention to it [by] saying anything.
PLAINTIFF'S COUNSEL: Okay. I would
THE COURT: And that was my discretion.
PLAINTIFF'S COUNSEL: Just for the record, I would even just to avoid anycertainly didn't want to do anything wrong and I'm not even sure at this point exactly what the situation is, whether I did or not, because my notes go both ways on it. I would consent to a curative instruction as strong as the Court would like to make it to disregard it, just to play it safe, because I think it is a non-issue.
THE COURT: No. It's my discretion and I've exercised it and I'm satisfied that if this case is reversed, it's not going to be because of that. It's my call.
PLAINTIFF'S COUNSEL: Okay. Thank you. (End of sidebar conference)
"Counsel [in his summation to a jury] may `not misstate the evidence nor distort the factual picture.'" Condella v. Cumberland Farms, Inc., 298 N.J.Super. 531, 534, 689 A.2d 872 (1996) (quoting Matthews v. Nelson, 57 N.J.Super. 515, 521, 155 A.2d 111 (App.Div.1959), certif. denied, 31 N.J. 296, 157 A.2d 364 (1960)). Counsel is to be given "broad latitude" in summation but "comment must be restrained within the facts shown or reasonably suggested by the evidence adduced." Condella, supra, 298 N.J.Super. at 534, 689 A.2d 872 (quoting State v. Bogen, 13 N.J. 137, 98 A.2d 295, cert. denied sub nom., Lieberman v. State of New Jersey, 346 U.S. 825, 74 S.Ct. 44, 98 L. Ed. 350 (1953)).
Plaintiff's counsel concedes that the reading of Dr. Scotti's deposition testimony during summation was improper. However, plaintiff alleges that Dr. Fernandez was not prejudiced because Dr. Scotti's testimony was immaterial to Dr. Fernandez's defense. However, contrary to the assertion of plaintiff's counsel, the deposition testimony in question directly attacked Dr. Fernandez's proximate cause defense. If Basilica was still sick on November 21, this would support plaintiff's argument that the infant had a long standing progressive problem that would have been present, detectable and treatable on November 30, the day that Dr. Fernandez allegedly refused to treat the child.
Allowing this deposition testimony to be presented to the jury without having afforded defense counsel an opportunity to address it during the trial was prejudicial. The testimony suggested an inference that Dr. Scotti believed that the infant was still sick on November 30, directly contradicting his trial testimony and Dr. Fernandez's causation defense that the illness which caused Basilica's death was an acute condition that came on suddenly, after November 30, and was therefore not detectable or treatable, even if Dr. Fernandez had examined the child. At a minimum, a curative instruction was required to inform the jury not to consider the deposition testimony presented during *329 summation. Such conduct cannot be excused on counsel's confusion. The testimony should have been stricken and the jury properly instructed.

III.
At least six times during the trial, plaintiff's counsel referred to Dr. Fernandez as the "captain of the ship." First, in his opening statement, plaintiff's counsel stated:
But, something went wrong that day. Something screwed up. Okay, and the doctor is the captain of the ship, remember that. You're going to hear about nurses and receptionists and, you know, they didn't, they didn't bring the proper chart in, they screwed up. She shouldn't have been on the calendar, all kinds of things like that. Okay? But the doctor is the captain of the ship. Okay? She's not, you know, responsible, she's not obligated to go to the receptionist and make sure the right records are transferred over or the nurse or whatever. She goes to the doctor, okay, and she relates her information.
Then, during cross examination of Barbara Grasso, R.N., the pediatric nurse responsible for the general running of the clinic, plaintiff's counsel asked Nurse Grasso the following questions:
Q [W]ould you agree with the statement that it's the doctor that has the ultimate responsibility for the care of the child?
A I think we're all responsible.
Q I'm talking about the ultimate responsibility. Who is it, the doctor or the nurse?
A The doctor.
Q The doctor, okay. And would you agree that under no circumstances should a doctor abdicate that responsibility to anybody else?
A Correct
....
A Should a doctor
Q Ever abdicate that responsibility to anybody?
A No, no.
Q A doctor is captain of the ship, aren't [sic] they?
A Yes.
And again, during cross examination of Dr. Fernandez at trial, the following exchange took place:
BY PLAINTIFF'S COUNSEL:
Q Doctor, if it comes between doctors and nurses,doctors routinely give nurses orders, do they not?
A That is correct.
Q Okay. And nurses don't give doctors orders. Is that correct?
A That is correct.
Q And the person that is ultimately responsible for the care of a child, with the care, or let's say ultimately responsible for a patient is the doctor, is it not?
A That is correct.
Q Okay. It's not the nurse, is it?
A That is correct.
Q It's not the receptionist, is it?
A That is correct.
Q It is the doctor, right?
A That is correct.
Q The doctor is the captain of the ship, is he not? Or is she not?

DEFENSE COUNSEL: Note my objection, judge.
THE COURT: overruled.
Q The Doctor is the captain of the ship, so to speak, when it comes to patient care?
A So to speak.
Q Okay. Would that be a yes?
A So to speak. I've never hear that term before.
Q Okay. Do you agree?
A The captain of the ship?
Q Yes. The person in charge. How's that?
A The person in charge.
Q Is the physician? Is that correct?
A That is correct.
Q Okay.

[Emphasis added]
Twenty-five years ago, in Sesselman v. Muhlenberg Hosp., 124 N.J.Super. 285, 290, 306 A.2d 474 (App.Div.1973), we rejected the
*330 "captain of the ship" doctrine as a basis for liability. The doctrine remains in disfavor. See, e.g., Tobia v. Cooper Hosp. University Med. Center, 136 N.J. 335, 346, 643 A.2d 1 (1994); Lanzet v. Greenberg, 243 N.J.Super. 218, 231-32, 579 A.2d 309 (App.Div.1990), rev'd on other grounds 126 N.J. 168, 175, 594 A.2d 1309 (1991); Johnson v. Mountainside Hosp. 239 N.J.Super. 312, 322, 571 A.2d 318 (App.Div.), certif. denied, 122 N.J. 188, 584 A.2d 248 (1990); Whitfield v. Blackwood, 206 N.J.Super. 487, 503 A.2d 311 (App.Div.1985), aff'd in part, rev'd in part, 101 N.J. 500, 502 A.2d 1132 (1986). The doctrine suggests imposing vicarious liability on a doctor because of the negligence of others not under the doctor's control or supervision. Where a litigant improperly seeks to utilize this doctrine, we have imposed an affirmative obligation on the trial judge "to make certain that the jury [is] not misled by legal doctrines not urged as a proper basis for liability." Whitfield v. Blackwood, supra, 206 N.J.Super. at 493-94, 503 A.2d 311.
A critical issue in this case was whether plaintiff had made an appointment for Basilica for November 30; if so, with whom, and whether such information was communicated to defendant by the hospital staff. The "captain of the ship" references were designed to lead to the inference that defendant was responsible for the actions of the hospital staff and liability could be imposed on her for the staff's failures.
Plaintiff disingenuously asserts that the reference to "captain of the ship" was "by analogy only." While no specific third-party was identified as responsible for Basilica's chart not being pulled, the case was tried on the theory that administrative errors had occurred in processing Basilica for examination. In that context the reference to Dr. Fernandez as "captain of the ship" suggested to the jury that somehow she was responsible for any administrative mistake.
It was not only improper for plaintiff's counsel to refer to the doctrine, it was error for the trial judge to fail to cure the impropriety with an appropriate charge to remove from the case any suggestion of vicarious liability. Counsel argues that he was unaware that the phrase "captain of the ship" was ever utilized as a legal doctrine for vicarious liability.[3] If the phrase is not used we are at a loss to understand counsel's use of the phrase and the appropriate context for such usage. The phrase was used for the exact reason it has been interdicted and any suggestion to the contrary is unacceptable.

IV.
The three grounds on which we reversefailure to adequately cure counsel's reference to defendant's termination; failure to cure counsel's improper reference to deposition testimony during summation; and failure to cure counsel's improper references to the "captain of the ship"formed the basis of defendant's application for a new trial. The trial judge denied the motion suggesting that the errors had either been cured or were irrelevant to the issues in dispute. We disagree.
R. 4:49-1(a) provides:
A new trial may be granted to all or any of the parties and as to all or part of the issues on motion made to the trial judge.... The trial judge shall grant the motion if, having given due regard to the opportunity of the jury to pass upon the credibility of the witnesses, it clearly and convincingly appears that there was a miscarriage of justice under the law.
A trial court's ruling denying defendant's motion for a new trial will not be disturbed unless it clearly appears that there was a miscarriage of justice under the law. Caldwell v. Haynes, 136 N.J. 422, 432, 643 A.2d 564 (1994); Jenoff v. Gleason, 215 N.J.Super. 349, 359, 521 A.2d 1323 (App.Div. 1987); R. 2:10-1. Where the issue does not involve the trial court's fact-finding role, but rather its exercise of discretion, the appellate *331 court will not interfere unless the trial judge has "pursue[d] a manifestly unjust course." Gillman v. Bally Mfg. Corp., 286 N.J.Super. 523, 528, 670 A.2d 19 (App.Div.), certif. denied, 144 N.J. 174, 675 A.2d 1122 (1996). So, too, a decision to grant or deny a motion for a mistrial will not be reversed unless there is a showing of a mistaken exercise of discretion. State v. Mance, 300 N.J.Super. 37, 57, 691 A.2d 1369 (App.Div. 1997); State v. Winter, 96 N.J. 640, 647, 477 A.2d 323 (1984).
Each of these errors were generated by the actions of plaintiff's counsel injecting into the case matters which were barred by the trial judge's ruling or as matters of law. In each instance we have commented about the insufficiency or absence of curative charges to correct or minimize the error. However, a trial is a dynamic organism which can be desensitized by too much error or too much curative instruction. See, e.g., Hofstrom v. Share, 295 N.J.Super. 186, 193, 684 A.2d 981 (App.Div.1996), certif. denied, 148 N.J. 462, 690 A.2d 610 (1997) (noting that where an attorney persists in making unwarranted prejudicial appeals to a jury which taint the verdict, we have often held that a reversal is in order). We conclude that there were too many errors here, the errors relate to relevant matters and in the aggregate rendered the trial unfair necessitating a new trial. State v. Orecchio, 16 N.J. 125, 129, 106 A.2d 541 (1954).

V.
Because we are remanding for a new trial, we need not consider defendant's arguments that the verdict was against the weight of the evidence or that Dr. Richard Reutter, M.D.'s testimony would be barred because of failure to provide adequate notice under R. 4:17-7. Both issues are now rendered moot by a new trial.
As to the remaining issues raised by defendant, we have carefully reviewed the record and conclude that such arguments are without merit. R. 2:11-3(e)(1)(A) and (D).
We reverse and remand this matter for a new trial.
NOTES
[1] For ease of reference, "plaintiff" will refer to Jill Diakamopoulos.
[2] The jury found no negligence on the part of Tamara McCluskey, M.D.; Monmouth Medical Center was dismissed by motion.
[3] We view with some skepticism the following churlish comment made by plaintiff's counsel in his brief:

This counsel was unaware that the phrase "captain of the ship" was ever utilized at law as a legal doctrine for vicarious liability. In the future, a "pilot of the airplane" analogy will be utilized by this counsel whenever it is alleged that a plane crashed because the ground crew pointed it in the wrong direction.