# RECORD IMPOUNDED

NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2693-24

L.G.-P. and R.P., h/w,
individually and as parents
and natural guardians
of S.P., a minor,

      Plaintiffs-Appellants,[1]

v.

RIVERVIEW MEDICAL
CENTER, HACKENSACK
MERIDIAN HEALTH,
and JOEL EDMAN, M.D.,

      Defendants-Respondents,

and

GRACE YIA, M.D.,

      Defendant.

_____

> APPROVED FOR PUBLICATION
> **March 24, 2026**
> APPELLATE DIVISION

      Argued March 2, 2026 – Decided March 24, 2026

      Before Judges Sabatino, Walcott-Henderson, and Bergman.

---

[1] We use initials for the family members to protect the privacy of the disabled child.

On appeal from the Superior Court of New Jersey, Law Division, Monmouth County, Docket No. L-2420-20.

Daniel S. Weinstock argued the cause for appellants (Feldman, Shepherd, Wohlgelernter, Tanner, Weinstock & Dodig, LLP, attorneys; Daniel S. Weinstock and Carolyn M. Chopko, on the briefs).

John M. Hockin, Jr. argued the cause for respondents (Ronan, Tuzzio & Giannone, PC, attorneys; John M. Hockin, Jr., of counsel and on the briefs; Robert M. Pacholski, on the briefs).

The opinion of the court was delivered by

SABATINO, P.J.A.D.

This appeal presents important issues concerning the alleged duties of a hospital and its department chair to ensure that non-employee physicians who practice there will adhere to hospital policies and patient discharge standards. We also consider the reasonable specificity necessary to articulate the pertinent standards of care in a malpractice case alleging such supervisory failures.

The case arises from an infant delivered at the hospital who presented at birth with jaundice. The infant's attending pediatrician, who was selected by the parents, was not employed by the hospital, but had clinical privileges to practice there.

At the time of the jaundiced infant's discharge, the pediatrician orally advised the parents they could safely place the child at home in indirect sunlight.

2

That advice indisputably conflicted with then-existing national standards of pediatric care and the hospital's own internal discharge policy.

The parents took the infant home, but the child's jaundice worsened. Three days later, the parents returned the infant to a different hospital, where it was discovered that the baby had sustained brain damage and cerebral palsy. The parents sued the attending pediatrician, the delivery hospital, and the chair of the hospital's department of pediatrics for medical malpractice.

After plaintiffs settled with the pediatrician, they continued to pursue additional recovery from the hospital and the department chair. In doing so, plaintiffs stressed that the hospital's by-laws specifically obligate its department chairs to maintain "continuing surveillance and oversight" of "all [p]ractitioners with [c]linical [p]rivileges and of all [a]ffiliates" at the hospital, and to "enforce" within their departments the hospital's "policies," "including initiating corrective actions and investigations of clinical performance."

Plaintiffs also stressed deposition testimony recounting that at least five other pediatricians at the hospital had been known to give similar discharge advice recommending treatment with indirect sunlight. The department chair testified at his deposition that he had been unaware of those instances. Their expert opined that the failures of the department chair and the hospital to enforce

3

its policy for jaundiced infants breached standards of care and were a proximate cause of this infant's permanent disability.

The trial court granted summary judgment to the codefendants, finding the chair had no notice of the attending physician's divergent discharge practices and that imposing liability in these circumstances would violate case law prohibitions on "captain of the ship"[2] theories of liability.

On appeal, we recognize that, as the department chair acknowledged at his deposition, he had a general duty to ensure that hospital policies were observed by non-employee doctors who had privileges in his department. However, plaintiff's expert did not specify in his reports, nor at his deposition, how that general duty was supposed to be carried out. Apparently, it was not until oral argument on this appeal that plaintiffs' counsel conceptually described measures that should have been taken.

We do not regard plaintiffs' liability theory based on negligent failure to ensure hospital policies are implemented by doctors who are subject to supervision as a prohibited "captain of the ship" claim. Even so, plaintiffs were

---

[2]  The "captain of the ship" theory "impos[es] vicarious liability on a doctor because of the negligence of others not under the doctor's control or supervision." Diakamopoulis v. Monmouth Med. Ctr., 312 N.J. Super. 20, 35 (App. Div. 1998).

required—before discovery closed—to delineate with reasonable specificity the standards of care of policy enforcement and departmental oversight that the codefendants allegedly breached. Having failed to do so, plaintiffs' claims were properly dismissed, even viewing the record in a light most favorable to them.

I.

Plaintiffs' child, S.P., was born in August 2018 at defendant Riverview Medical Center in Red Bank ("the hospital" or "Riverview"). At the time of the infant's birth, defendant Joel Edman, M.D., was the chairman of the hospital's Department of Pediatrics, but he was not a hospital administrator. Dr. Edman was employed by the hospital.

Upon birth, S.P. exhibited jaundice, and a blood test showed S.P. had heightened bilirubin levels. Both conditions are risk factors for what is known as hyperbilirubinemia.[3]

At plaintiffs' request, defendant Grace Yia, M.D., became S.P.'s attending pediatrician when S.P. was admitted to the hospital directly after birth. At that time, Dr. Yia, who is Board-certified in pediatrics, had privileges at the

---

[3] "Hyperbilirubinemia" is defined in Stedman's Medical Dictionary 918 (28th ed. 2013) as "[a]n abnormally high level of bilirubin in the circulating blood, resulting in clinically apparent icterus or jaundice when the concentration is sufficient."

A-2693-24

hospital.[4]  She was not an employee of the hospital.  Dr. Yia described her involvement as being limited to attending to newborn patients only after a parent specifically requested her care.

Dr. Yia first examined S.P. on the day after S.P.'s birth.  She noted the infant's bilirubin levels and observed the jaundice.

The following day, Dr. Yia again examined S.P., noting the child's condition was "[u]nremarkable . . . except for jaundice of face and chest."  Dr. Yia's examination notes from that day, two days post-birth, additionally stated:

> At the time of my evaluation of the infant [two days after birth], I discussed jaundice with the parents including physiologic jaundice and what they should do at home with the child including the use of sunlight and lamp.  I advised that they should look for poor feeding, lethargy, poor cry and that if the jaundice appeared to get worse they should contact me.
>
> I also discussed with the parents that the mother could continue to breastfeed the child or she could supplement with formula and that they could contact me after discharge if they had any questions or concerns and that they should follow-up in my office on Monday [three days later].

---

[4]  Plaintiffs do not claim the hospital negligently credentialed Dr. Yia or that she was incompetent to treat patients there.  Hence, plaintiffs' citation to Corleto v. Shore Mem'l Hosp., 138 N.J. Super. 302, 309 (Law Div. 1975), involving conduct by a non-employee doctor who was claimed to be incompetent, is not on point.

A-2693-24

[(Emphasis added).]

S.P. was discharged from the hospital later that same day. The discharging nurse, Patty Ann Hansen, R.N., testified that it was her practice and the practice of the hospital to supply "information and written guidelines to all parents regarding newborn jaundice prior to discharge."

When asked at her deposition about the conversation between Dr. Yia and plaintiffs before S.P.'s discharge, Nurse Hansen recalled:

> [Dr. Yia] just said that the baby had mild jaundice and that . . . the family was concerned about feeding. . . . Dr. Yia had just said about the – the importance of frequently feeding the baby, to place the baby near a window that was a sunny location to help break down the bilirubin. She said . . . just to monitor the baby and to feed the baby frequently, the importance of watching the voids and stools of the baby. And then at that point I think I had left to go get the formula because . . . they were concerned that they didn't have enough milk. . . . And I exited the room at that point, so I missed the other part of the discharge, but that's all I was present for.

[(Emphasis added).]

Nurse Hansen further testified that she personally did not give any instructions about placing the child in the sun or under a lamp at home, as "the doctor had already done that, and [the nurse] didn't cover that in the morning." When asked if she typically instructs parents, upon discharge, to place jaundiced newborns in sunlight, Nurse Hansen testified:

7

> It's based on the doctor. So if the doctor says for us to tell them that based on their order, then I would do that. But I don't consistent – I can't say that I consistently always say to do that unless the doctor specifically says to put the baby in indirect sunlight.
>
> [(Emphasis added).]

Three days after S.P. was discharged, Dr. Yia received a phone call from the infant's mother, reporting that she observed "abnormal movements of the child." Dr. Yia instructed the mother to bring S.P. to an emergency room. The parents brought S.P. to a different hospital, one with whom Dr. Yia was not affiliated. S.P. was not under Dr. Yia's care at that point in time.

Ultimately, S.P. was diagnosed with "chronic bilirubin encephalopathy, also known as kernicterus," a severe condition of permanent brain damage.

The CDC and AAP Guidelines, and the Hospital's Policy

As of the time of these relevant events, national guidelines recommended against placing jaundiced infants in indirect sunlight as a form of treatment for that condition. The record includes a "Jaundice Alert" issued by the Center for Disease Control ("CDC"). The Alert was notably subtitled "What Every Parent Needs to Know." Among other things, the Alert unambiguously stated that "[p]utting your baby in sunlight is not recommended as a safe way of treating jaundice." In her deposition, a nurse leader who worked in the Pediatrics Unit

8

confirmed her familiarity with the CDC Jaundice Alert, and acknowledged the Alert does not distinguish between direct and indirect sunlight.

In addition, the American Academy of Pediatrics ("AAP") at that time apparently recommended against the use of sunlight as a treatment modality for hyperbilirubinemia.[5] Moreover, Riverview had adopted a written policy that similarly provided such guidance.[6]

Testimony that Multiple Physicians at Riverview Recommended Indirect Sunlight

According to deposition testimony of two fact witnesses, in addition to Nurse Hansen, multiple physicians at Riverview had a practice of advising parents with jaundiced infants upon discharge to use indirect sunlight as a form of treatment. A physician in the department, who personally believed that such indirect sunlight treatment was not dangerous, identified four other pediatricians in his group at Riverview who had given such an instruction in addition to

---

[5] The parties have not supplied a copy of the AAP guidelines in their appendices, but it is referred to multiple times by witnesses in the record.

[6] The parties have not furnished a copy of the hospital policy in the appellate appendices, although it is identified in the defense expert's report as "Policy ID 3621922 Hyperbilirubinemia – Assessments of Newborns in Maternal Child Services." The policy is also referred to by Dr. Edman, Nurse Hansen, and plaintiffs' expert in their depositions.

A-2693-24

himself. Additionally, the nurse leader testified she had heard of an unquantified number of physicians giving such instructions regarding indirect sunlight. The nurse leader did not know if those physicians had "ever [been] told by Riverview that they should not give that instruction to families."[7]

This Lawsuit

Plaintiffs filed this negligence action in the Law Division in August 2020 on behalf of themselves individually and as parents and guardians of S.P. They initially named as defendants Riverview, an affiliated health system (Hackensack Meridian Health),[8] and Dr. Yia. Dr. Edman was added as a defendant through an amended complaint in March 2022.

The complaint largely alleged that Dr. Yia's discharge instructions to plaintiffs, particularly telling them it was acceptable to place their infant in indirect sunlight, negligently breached pediatric standards of care. Plaintiffs

---

[7]  Nurse Hansen testified that she was unaware of any pediatricians or neonatologists at Riverview who ever "instructed a family to place a jaundiced baby under a lamp at home." As noted above, Nurse Hansen did allude, however, without estimating their number, to doctors who instructed parents that they could use indirect sunlight, although she agreed the practice was "not uncommon" at the hospital.

[8] For ease of discussion, our references to "Riverview" and "the hospital" should be understood to subsume the health system.

A-2693-24

claimed the improper instructions were a proximate cause of S.P. not being treated sooner and developing brain damage.[9]

Apart from those allegations, plaintiffs also pled claims of negligent failures by defendants to adopt and enforce appropriate hospital policies. Among other things, the amended complaint alleged that the hospital and Dr. Edman were liable by:

> d.    Negligently failing to create and implement appropriate policies, procedures, protocols, and instructions to ensure that medical staff, doctors, and other agents and/or employees involved in the treatment and care of patients at Riverview Medical Center were adequately trained to diagnose and treat the signs and symptoms of hyperbilirubinemia and/or associated neurological injury in neonatal infants; and
>
> e. Negligently failing to supervise physicians, nurses, and other providers caring for pediatric patients, including but not limited to negligently permitting the practice of physicians discharging jaundiced newborns with the instruction that they be placed in sunlight.

Defendants denied liability as to all of plaintiffs' claims, and the case proceeded to discovery.[10]

---

[9]  We need not delve into these disputed causation issues, given the nature of our legal analysis that hinges on standards of care.

[10]    Presumably, plaintiffs supplied defense counsel with the necessary affidavit(s) of merit ("AOMs") required under N.J.S.A. 2A:53A-27, although

<u>Dr. Yia's Deposition Testimony and Settlement with Plaintiffs</u>

Dr. Yia was deposed in August 2021. During her deposition, she estimated that she had been seeing patients at Riverview in 2018 periodically, with varying frequency. She stated that she was aware of the hospital's policies during that time frame for treating newborns.

Dr. Yia agreed in her testimony that indirect sunlight is not a reliable or safe treatment for elevated bilirubin, but regarded it as a supportive measure. At some point unspecified in the record before us, Dr. Yia settled all claims and a stipulation of dismissal was entered as to her.

<u>The Parties' Experts</u>

Plaintiffs and defendants retained medical experts who presented competing opinions about whether defendants deviated from standards of care and proximate causation. Plaintiffs' expert is a Board-certified pediatrician and neonatologist with decades of experience in hospital and private practice settings. His experience includes several years as the director of a hospital's neonatal unit. Defendants' expert comparably is a Board-certified neonatologist,

---

the AOMs were not furnished in the appellate appendices. Since there is no claim by defendants that plaintiffs tendered a deficient AOM, our opinion in <u>Hargett v. Hamilton Park OPCO, LLC</u>, 477 N.J. Super. 390, 397 (App. Div. 2023), <u>certif. denied</u>, 256 N.J. 453 (2024), concerning the AOM requirement is not pertinent.

A-2693-24

who has respectively served as the director and co-medical director at two hospitals. The parties have not contested before us the qualifications of either expert.

In his two successive reports and deposition testimony, plaintiffs' expert criticized the discharge instructions the parents received that recommended indirect sunlight for their jaundiced child. Among other things, he opined that "[t]he hospital's obstetrical nurses, the pediatric and neonatal physicians, and their leadership teams all share responsibility for the continued use [of] indirect phototherapy for treatment of neonatal jaundice. This was a proximate cause of [S.P.'s] brain injury." The expert also specifically criticized Dr. Edman and the hospital for failing to ensure the hospital's policy against indirect sunlight treatment were carried out:

> Dr. Edman and [the hospital] allowed the discharge practice described above to proliferate. Its duration and prevalence as described in the depositions constitute chronic substandard practice, and the failure to be aware of the practice and/or to correct it was below the standard of care. That failure caused and contributed to the injuries sustained by [S.P.].

In opposition, defendants' expert opined that "the use of indirect sunlight did not cause or contribute to [S.P.'s] injuries." The defense expert noted that the hospital "had an appropriate policy in August 2018," which was "designed

13

to 'provide guidelines for assessment of risk and ongoing monitoring of newborn hyperbilirubinemia in the hospital setting.'" He further stated that the hospital had appropriate written discharge instructions given to the parents of newborns "which were consistent with the standard of care." He added that the discharge packet properly included the CDC Jaundice Alert. The defense expert also stated that "it is not the responsibility of Dr. Edman to micromanage the practice of the pediatricians at the hospital."

<u>Summary Judgment and Denial of Reconsideration</u>

The trial court granted summary judgment dismissing plaintiffs' claims against the codefendants who had remained in the case after Dr. Yia settled. In a written opinion, the motion judge concluded that plaintiffs failed to demonstrate a tenable duty owed by Dr. Edman to them. The judge regarded their assertions of such a duty as a disallowed "captain of the ship" theory. Additionally, the court found that:

> In order to accept [p]laintiff[s'] arguments as presented before it, the [c]ourt would have to conclude that the entirety of the individuals working within the [p]ediatrics [d]epartment were/are under the direct control of Dr. Edman even when Dr. Edman is not present at the time of subject care and that Dr. Edman has a duty to directly supervise the acts of all individuals administering said care.
>
> . . . .

14

. . . Dr. Yia had a wide variety of methods to conform her conduct with what is permitted by hospital policy and ultimately the proper standard of care, and as voiced by [plaintiffs' expert], it was not specifically under the sole and direct scope of Dr. Edman to supervise Dr. Yia and inspect each and every instruction which she provided. Furthermore . . . all of the facts presented before the Court demonstrate that Dr. Edman had no knowledge of any instruction allegedly provided by Dr. Yia.

The court also granted the hospital's motion for summary judgment. In particular, the court found that "[p]laintiffs' proofs are insufficient to establish proximate causation. Furthermore, it is irrelevant that other physicians at [the hospital] also gave this instruction [for indirect sunlight treatment] or that such instruction was commonplace. There is no evidence that those facts contributed to Dr. Yia's use of this instruction." Plaintiffs moved for reconsideration, which the court denied.

The present appeal ensued.

II.

Plaintiffs argue the trial court erred in granting summary judgment in favor of the hospital and Dr. Edman, principally for having failed to view the record in a light most favorable to their claims. Plaintiffs further contend that the court misunderstood their claims of supervisory and policy enforcement

15

liability, mistakenly deeming such arguments to be prohibited "captain of the ship" theories.

In assessing these arguments, we apply certain well-established principles. On a motion for summary judgment, courts must view "'the competent evidential materials presented . . . in the light most favorable to the non-moving party, [and determine whether they] are sufficient to permit a rational factfinder to resolve the alleged disputed issue in favor of the non-moving party.'" Town of Kearny v. Brandt, 214 N.J. 76, 91 (2013) (quoting Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 540 (1995)); see also R. 4:46-2(c). "To decide whether a genuine issue of material fact exists, the trial court must 'draw[] all legitimate inferences from the facts in favor of the non-moving party.'" Friedman v. Martinez, 242 N.J. 450, 472 (2020) (alteration in original) (quoting Globe Motor Co. v. Igdalev, 225 N.J. 469, 480 (2016)). We apply these same principles on appeal, de novo, in reviewing summary judgment rulings. Townsend v. Pierre, 221 N.J. 36, 59 (2015).

Basic principles of medical malpractice (also known as "medical negligence") law also govern this matter. "'A medical malpractice case is a kind of tort action in which the traditional negligence elements are refined to reflect the professional setting of a physician-patient relationship.'" Worthy v.

16

Kennedy Health Sys., 446 N.J. Super. 71, 91 (App. Div. 2016) (quoting

Verdicchio v. Ricca, 179 N.J. 1, 23 (2004)). "To establish a prima facie case

for medical negligence, 'a plaintiff must present expert testimony establishing

(1) the applicable standard of care; (2) a deviation from that standard of care;

and (3) that the deviation proximately caused the injury.'" Ibid. (quoting

Koseoglu v. Wry, 431 N.J. Super. 140, 156 (App. Div. 2013)). In this appeal,

we particularly focus on the first two elements, i.e., the standards of care and

the alleged deviations from those standards.

In pursuing their claims against Dr. Edman and the hospital, plaintiffs and

their expert emphasize the hospital's by-laws and the responsibilities of a

department chair set forth in those by-laws.[11] We examine that argument by first

discussing the regulatory backdrop of such by-laws.

Under New Jersey Department of Health ("NJDOH") licensing standards,

hospitals in this state are required to "establish and implement written policies,

procedures, and bylaws." N.J.A.C. 8:43G-5.2(a); see also Belmar v. Cipolla, 96

N.J. 199, 208 (1984) (noting that "hospitals must adopt rules, regulations, and

bylaws concerning procedures for admission to staff membership"); N.J.A.C.

_____

[11] Some of the legal authorities and portions of this record do not hyphenate the word "by-laws," but we have not altered the spelling when quoting those sources.

8:43G-5.1 (stating general hospital organizational and written policy requirements); N.J.A.C. 8:43G-5.2(i) (stating requirements that include formal title definitions, policies for ongoing requirements for credentials, and written criteria for disciplinary action).

In addition, NJDOH regulations mandate the implementation of medical staff by-laws, which control supervisory responsibilities of department chairs and the organizational hierarchy in reviewing events in which the medical staff fail to meet quality-of-care standards:

> (a) There shall be an organized medical staff that is responsible to the governing body of the hospital. Bylaws governing all medical staff members shall be implemented.
>
>      . . . .
>
> (f) The medical staff shall be divided into clinical departments. Each department shall be directed by a director, physician director, chairman or chief who is responsible for its administration and for taking or recommending action in those instances in which staff members fail to meet the department's standards of quality of care.
>
> (g) There shall be an executive committee for the medical staff which performs supervisory functions, including reviewing patient care policies and procedures and serving as a forum for discussing patient care issues identified by the clinical departments.

18

[N.J.A.C. 8:43G-16.1 (emphasis added).]

The record before us includes over eighty pages of detailed by-laws of the hospital that were in effect as of 2018 at the time of S.P.'s birth. Of pertinence here is Article 12 detailing the obligations of hospital officers. In particular, Article 12.2 specifies the qualifications, selection, and various aspects of a Department Chair. Section 12.2.5, entitled "Duties," declares that:

> Each Department Chair shall be responsible for the clinical, administrative and other activities and functions of the Department, including, but not limited to:
>
> . . . .
>
> (b) Develop and implement departmental programs, in cooperation with the Medical and Dental Staff President and appropriate committees of the organized Medical and Dental Staff, for credentials review and Privileges delineation, orientation and continuing medical education, quality/resource management, concurrent monitoring o[f] practice, and retrospective quality improvement control.
>
> . . . .
>
> (d) Maintaining continuing surveillance and oversight of the professional performance of all Practitioners with Clinical Privileges and of all Affiliates with permission to perform specified services in the Department, including monitoring the quality of medical histories and physical examinations performed by such individuals, and report regularly thereon to the Medical Executive Committee.

19

. . . .

(g) <u>Enforce</u> within the Department the Bylaws, Rules and Regulations, <u>policies</u>, and other requirements of Hospitals Corp., the Division, the organized Medical and Dental Staff, and the Department, including initiating corrective actions and investigations of clinical performance. [and]

. . . .

(t) Provide <u>continuous assessment and improvement</u> of the quality of care, treatment and services provided within the Department.

[(Emphasis added).]

Notably, at his deposition, Dr. Edman agreed that sunlight and lamp light are not "reliable or safe therapeutic tool[s] for hyperbilirubinemia." He further agreed that AAP guidelines on that subject "were expected to be followed," and that "part of [his] role as chair [was] <u>ensuring</u> that pediatricians who were practicing at Riverview were following AAP guidelines." (Emphasis added). Dr. Edman also acknowledged that during his tenure as chair of the Pediatrics Department, "part of [his] <u>responsibility</u> [was] <u>the supervision</u> of pediatric physicians at Riverview." (Emphasis added).

With respect to the hyperbilirubinemia policy, Dr. Edman explained that he endeavored to perform his responsibilities as department chair in several ways. He noted that the hospital's policy was discussed at departmental

20

meetings, which occurred monthly, and that "affiliated physicians" such as Dr. Yia were "expected to attend those department[al] meetings." He recalled the policy was "reviewed at a department[al] meeting" when it was "first instituted," and would have been discussed again when it was revised after 2019.

Dr. Edman testified that during his tenure as department chair he was unaware that some pediatricians at Riverview "would send patients home with the instruction that their jaundiced babies were to be placed in indirect sunlight."

Plaintiffs' expert asserted that Dr. Edman and the hospital should have been aware of what he characterizes as this "prevalent" practice during Dr. Edman's tenure. As we have noted above, the expert concluded that the failures of Dr. Edman and the hospital to have such awareness and to correct the practice was "below the standard of care." We reiterate that conclusion as expressed at the end of the expert's first report:

> Unfortunately, Dr. Edman and R[iverview] allowed the discharge practice described above to proliferate. Its duration and prevalence as described in the depositions constitute chronic substandard practice, and the failure to be aware of the practice and/or to correct it was below the standard of care. That failure caused and contributed to the injuries sustained by [S.P.].

In his second report, plaintiff's expert repeated those conclusions, tying them to the hospital's by-laws:

21

In fact, Bylaw 12.2.5(b), requiring "concurrent monitoring of practice" and "retrospective quality improvement control" completely undermines [defendants' expert's] testimony. This is not surprising. Under [defendants' expert's] testimony Dr. Edman's duty would be to wait until an adverse outcome occurs, and only then to perform any type of supervisory action. The goal is to prevent adverse outcomes in the first place, not solely to prevent them from reoccurring. There is no evidence in the record to suggest Dr. Edman performed any supervision at all in order to see whether Dr. Yia and others were giving discharge instructions in conformity with the Department's own policies or with the standard of care.

Defendants argue these contentions of supervisory breach are inconsistent with principles of our case law, place undue reliance on language in the by-laws, and fail to specify what Dr. Edman and the hospital should and could have done to meet the alleged standards of care. As part of that argument, they further invoke the prohibition on "captain of the ship" theories of vicarious liability, a prohibition the trial court underscored in its own analysis.

The captain of the ship doctrine was summarized and applied in Judge Carchman's opinion in Diakamopoulis, 312 N.J. Super. at 35, and in earlier published opinions cited in that case. See e.g., Tobia v. Cooper Hosp. Univ. Med. Ctr., 136 N.J. 335, 346 (1994); Lanzet v. Greenberg, 243 N.J. Super. 218, 231-32 (App. Div. 1990), rev'd on other grounds, 126 N.J. 168, 175 (1991); Johnson v. Mountainside Hosp., 239 N.J. Super. 312, 322, (App. Div. 1990);

22

Whitfield v. Blackwood, 206 N.J. Super. 487, 503 (App. Div. 1985), aff'd in part, rev'd in part, 101 N.J. 500, 502 (1986); Sesselman v. Muhlenberg Hosp., 124 N.J. Super. 285, 290 (App. Div. 1973). As explained in Diakamopoulis, the doctrine improperly "suggests imposing vicarious liability on a doctor because of the negligence of others not under the doctor's control or supervision." 312 N.J. Super. at 35 (emphasis added).

In the present case, plaintiffs' claims against Dr. Edman and the hospital, viewed in a light most favorable to them, are not entirely claims based on the negligence of others who are "not under the doctor's control or supervision." Ibid. (emphasis added). The use of the term "or" within that test signals that control and supervision are to be considered in the disjunctive. See Cox v. Sears Roebuck & Co., 138 N.J. 2, 19 (1994) (illustrating the disjunctive use of the term "or").

We agree with defendants that, as a Board-certified pediatrician credentialed by the hospital with clinical privileges, Dr. Yia was not under the "control" of Dr. Edman in terms of the specific care she was rendering to individual patients at the hospital. Dr. Edman was not plaintiffs' pediatrician, and nothing in the record indicates that he was consulted or involved in any way in S.P.'s care. We further agree with defendants that it would be unreasonable

23

to expect him to guarantee every outcome for patients treated by physicians, such as Dr. Yia, who have privileges in his department.

Control aside, the separate question of a department chair's duty to "supervise" other doctors working in that department is a more complicated matter. The Supreme Court recognized such supervisory responsibility in <u>Tobia</u>, 136 N.J. at 345-46, in which it reinstated failure-to-supervise claims against two hospital physicians who had such duties. In its analysis, the Court distinguished "captain of the ship" theories from such supervisory claims. The Court explained it was "not allowing liability to be imposed on the doctors merely because they were attending physicians on duty at the time of plaintiff's injury, but rather because the jury could find they had <u>specific duties</u> to train and to supervise the other employees on duty." <u>Id.</u> at 346 (emphasis added).

Plaintiffs argue that the by-laws quoted above impose such a duty to supervise and "enforce" the hospital's policy concerning indirect sunlight treatment for hyperbilirubinemia and discharge instructions. Defendants point to our opinion in <u>Johnson</u>, 239 N.J. Super. at 322-23, in which we held that by-laws <u>alone</u> cannot furnish the legal standard of care in a medical malpractice case. We made clear in Johnson that plaintiffs cannot "exalt an exhortatory statement in the by-laws of the [h]ospital into the legal standard for determining

whether or not the defendant physicians committed malpractice. The relevant legal standard is defined by law." Id. at 323 (citing Schueler v. Strelinger, 43 N.J. 330, 344 (1964)).

We do not believe Johnson bars plaintiffs in this case from relying upon the duties expressed in the by-laws, in addition to other indicia of the pertinent standards of care for the chair of the pediatrics department. Here, there are at least two such indicia: (1) the opinions of plaintiffs' expert informed by his undisputed experience as a specialist and a former hospital program director, and (2) Dr. Edman's own sworn acknowledgment of his duty to "enforce" the discharge policy.

But what exactly is that duty and the legal standard of care? On that critical question, plaintiffs' claims, as presented, fall short. The reports of plaintiffs' expert do not reasonably specify what Dr. Edman did incorrectly or otherwise failed to do in his role as a department chair with respect to the discharge instructions. It is undisputed that the hospital's policy disfavoring sunlight as a treatment practice was developed within the department, discussed at one or more departmental meetings that would include non-employee doctors with privileges, and thereby mandated. The discharge packet provided to

parents apparently included the CDC Jaundice Alert cautioning that the practice was not safe as a form of treatment.

Plaintiffs' expert contends that the deposition testimony of the nurses and another doctor within the department substantiate that deviations from the policy by several individual practitioners were "allowed" to "proliferate." Their expert further declares that "the failure to be aware of the practice and/or to correct it was below the standard of care." However, that standard of care is not set forth with any reasonable specificity within the expert's two reports. Nor was it reasonably specified at his deposition.[12]

Plaintiffs' counsel asserted conceptually at oral argument on appeal that the standards of care required Dr. Edman to undertake at least two things: (1) a review of patient charts to assure compliance with the hospital's policy; and (2) discussions with the practitioners within the department about the subject.

_____

[12] On cross-examination at the deposition, plaintiffs' counsel did ask his expert about passages within an AAP sentinel alert and from another professional advisory on the subject of hyperbilirubinemia, neither of which had been cited in the expert's two reports. The passages quoted from those sources in the deposition transcript recommend that hospitals "raise awareness," "review their current patient care processes," and "identify strategies for risk reduction," but do not specify in those transcribed passages how to do so. The expert did not elaborate on the actual steps needed to be taken to comport with those general goals, beyond the adoption of the hospital's policy disapproving of sunlight therapy and the departmental meetings as described by Dr. Edman.

A-2693-24

Although we appreciate counsel's ingenuity, an oral argument on appeal is not an appropriate time to attempt to cure critical gaps in the expert reports and deposition testimony presented in discovery.

Moreover, plaintiffs have provided no reasonable specificity of the standards of care, in terms of the frequency and extent of patient chart reviews, how files are selected, any professional guidelines for conducting such reviews, and so forth. Likewise, plaintiffs' position is unspecified as to what discussions within the department are required, who must attend them, and why the meetings described by Dr. Edman at his deposition were insufficient.

A hallmark of a fair civil discovery process is reasonable notice of the expert contentions of an opposing party and the evidence and professional standards upon which that party intends to rely. See Rice v. Miller, 455 N.J. Super. 90, 105 (App. Div. 2018). That objective was not fulfilled here, because the expert proofs that plaintiffs tendered about standards of care lacked reasonable specificity. Indeed, case law from other jurisdictions illustrates the importance of standards of care being expressed with reasonable specificity, which unfortunately was absent here.[13]

---

[13] Other state courts have imposed comparable specificity requirements to delineate the standards of care. See Hurtt v. Goleburn, 330 A.2d 134, 136 (Del.

A-2693-24

1974) (in the context of a negligence action, "[t]he standards must be <u>stated with specificity</u> sufficient to enable the Court to determine if the conduct conformed to them") (emphasis added); <u>Locke v. Pachtman</u>, 521 N.W.2d 786, 792-94 (Mich. 1994) (finding that plaintiff had failed to provide a prima facie case of medical malpractice[,] in part because no specific testimony had been elicited "regarding <u>what</u> a reasonably prudent surgeon <u>would have done</u>") (emphasis added); <u>Uriegas v. Kenmar Residential HCS Servs., Inc.</u>, 675 S.W.3d 787, 789 (Tex. 2023) ("[i]n articulating the standard of care and breach, an expert report 'must set forth "<u>specific information</u> about what the defendant should have done differently"'; that is, '"what care was expected, but not given"'") (internal citations omitted) (emphasis added); <u>Havens v. Hoffman</u>, 902 P.2d 219, 223 (Wyo. 1995) ("[t]he standard of care [in a medical malpractice case] must be stated <u>with specificity</u> sufficient to enable the court to determine if [the plaintiff] properly disclosed the risks and alternatives in conformance with the standard") (internal citation omitted) (emphasis added); <u>Johnson v. Schafer</u>, 565 S.W.3d 144, 148 (Ark. Ct. App. 2018) (ruling that plaintiff's expert's testimony did not state the standard of care "<u>with specificity</u>") (emphasis added); <u>Dunham v. Univ. of Maryland Med. Ctr.</u>, 187 A.3d 757, 766 (Md. App. Ct. 2018) (a plaintiff in a medical malpractice action "must 'identify with some <u>specificity</u>, the person whose actions should be evaluated'") (internal citation omitted) (emphasis added); <u>Tobin v. Providence Hosp.</u>, 624 N.W.2d 548, 569 (Mich. Ct. App. 2001); (ruling that "[t]he trial court . . . erred in failing to require that plaintiff's experts testify with <u>specificity</u> regarding the standard of care applicable to each medical professional whose failures of care allegedly constituted malpractice") (emphasis added); <u>Martinez v. Redford Cmty. Hosp.</u>, 384 N.W.2d 134, 135 (Mich. Ct. App. 1986) ("[w]e . . . hold that the degree of <u>specificity</u> required in pleading a medical malpractice action flows from the circumstances and nature of the case rather than from any objective heavier burden of pleading imposed on medical malpractice actions") (emphasis added); <u>Hogan v. Hattiesburg Clinic, P.A.</u>, 374 So. 3d 1264, 1269 (Miss. Ct. App. 2023) (ruling that plaintiffs had "failed to demonstrate with any <u>specificity</u> how further expert opinion would have established that [a doctor's] alleged breach proximately caused the injuries suffered by [one of the plaintiffs]") (emphasis added); <u>Renaissance Healthcare Sys., Inc. v. Swan</u>, 343 S.W.3d 571 (Tex. Ct. App. 2011) (reciting the proposition that, in a medical malpractice action, an "expert report must discuss 'the standard of care, breach, and causation with <u>sufficient specificity</u> to inform

We recognize that defense counsel did not argue below that the plaintiffs' expert violated the "net opinion" doctrine, perhaps waiting to raise it in a future motion in limine, if necessary. See Townsend, 221 N.J. at 53-55 (delineating the net opinion doctrine). But the deficiencies we have discussed here are not fundamentally "net opinion" defects, as they concern what exactly the standards of care are, rather than the expert's reasons for advocating them.

Hence, we affirm the trial court's grant of summary judgment to defendants, albeit for different reasons than those cited by the motion judge. See Isko v. Plan. Bd. of Livingston Twp., 51 N.J. 162, 175 (1968) (noting it is "commonplace" in appellate review to affirm orders on grounds different than those expressed by the trial court); State v. Armour, 446 N.J. Super. 295, 310 (App. Div. 2016) (applying that same principle). In doing so, we are keenly aware of the tragic condition of plaintiffs' child, but are obligated by the above legal reasons to uphold defendants' dismissal.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

M.C. Harley

Clerk of the Appellate Division

---

the defendant of the conduct that plaintiff has called into question and to provide a basis for the trial court to conclude that the claims have merit.'") (internal citation omitted) (emphasis added).

A-2693-24